THE DETROIT TUG & WRECKING COMPANY v. GEORGE GARTNER, WAYNE CIRCUIT JUDGE.

*New trial—Mandamus—Discretion of circuit judge.*

1. The granting of a new trial rests in the discretion of the trial court, which, if not abused, cannot be interfered with by the Supreme Court.

2. To warrant such interference, the abuse ought to be so plain that, upon consideration of the facts upon which the trial judge acted, an unprejudiced person can say that there was no justification or excuse for the ruling made.

3. In applications for *mandamus*, the Court must rely upon the facts set up in the answer of the respondent.

4. The fact that a judgment is obtained for or against a party who moves for a new trial has no bearing upon the question whether the judge has abused his discretion in granting or denying the motion.

5. For a review of cases bearing upon the *main* question decided, see page 371 of opinion.

Application for *mandamus* to compel respondent to grant a new trial. Submitted April 16, 1889. Denied June 21, 1889. The facts are stated in the opinion.

*Moore & Moore,* for relator.

*F. H. Canfield,* for respondent.

CHAMPLIN, J.    Application for *mandamus* to compel the circuit judge to grant a new trial.

The granting or refusing of a motion for a new trial is a matter which rests in the discretion of the trial court.   It is so clearly so that it is conceded that this Court has no jurisdiction to interfere with the decision of the circuit court, except it be to correct an abuse of the discretion exercised by it.

To warrant this Court in interfering in matters so entirely in the sound discretion of the circuit court as the granting or refusing of a new trial, the abuse of discretion ought to be so plain that, upon consideration of the facts upon which the court acted, an unprejudiced person can say that there was no justification or excuse for the ruling made.   It is therefore of the first importance that the *facts* upon which the circuit court acted in refusing a new trial in this case should be fully stated and considered.   In applications for *mandamus* this Court must rely upon the facts set up in the return or answer of the respondent.

The return of the circuit judge is as follows:

" This respondent, in answer to the order to show cause granted on the thirtieth day of October, 1888, respectfully shows:

" 1. It is true, as set forth in the petition of the relator, that a judgment was recovered by Henry McMorran, therein named, against Samuel A. Murphy; and this respondent shows that said judgment was for the sum of $3,329.28, upon a promissory note executed by said Murphy to the said McMorran.

" 2. It is also true that said McMorran caused a writ of garnishment to issue under the seal of said court against the First National Bank of Detroit, as garnishee of said Murphy, and that said bank filed its answer and disclosure to said writ, showing that there was on deposit in said bank the sum of $984.65 to the credit of Samuel A. Murphy; and said disclosure further shows that on the fourth day of January, 1888, it had received a notice, of which the following is a copy:

"'DETROIT, MICH,, Jan. 3, 1888.
"'CHAS. B. LOTHROP,
    "' Atty. First Nat. Bank,
        "' Detroit, Mich.,—

"' *Dear Sir:* All the money in the First National Bank to the credit of S. A. Murphy at the time said bank was garnished by Henry McMorran belonged to the Detroit Tug & Wrecking Company, and you are hereby notified that the company own the same, and will hold the bank responsible therefor.

"' Very truly yours,
    "' MOORE & MOORE,
        " 'Attorneys for Det. Tug & Wk. Co.'

"And this respondent shows that said Moore & Moore are also the attorneys for the said Samuel A. Murphy in the suit in which the aforesaid judgment was recovered.

"3. It is also true, as stated in said petition, that an order was entered in said garnishee suit, requiring the petitioner to appear and interplead, with which order the petitioner complied.

"4. That, said garnishee suit being at issue upon claims by said petitioner, said cause was regularly noticed for trial at the last June term of said circuit court; that said cause was set for trial on Friday, the twenty-ninth day of June, 1888, and that the usual printed notice that said cause would be reached on that day was sent to the attorneys of the respective parties, and that upon the application of said Moore & Moore, attorneys for said petitioner, the trial of said cause was postponed until the sixth day of July, 1888, at which time the plaintiff, who resides at Port Huron, was present in court with his witnesses, ready to proceed with said trial.

"That, upon said cause being called, the attorneys for said petitioner represented to the court that Samuel A. Murphy, named in said petition, was not present, and requested that said trial should be postponed until the next day, and that in compliance with said request the trial of said cause was postponed until the opening of the court on the following day, at which time the said plaintiff with his witnesses were in court, as were also the attorneys for said petitioner, and the said case was called for trial; that petitioner's attorneys stated to the court that they had given said Murphy notice; that they were in no position to ask for further indulgence or further delay; and that the said petitioner's attorneys made no request for any further postponement or for any further delay

in said trial, but proceeded with said trial without objection, and cross-examined witnesses for the plaintiff.

"After hearing the evidence offered by the plaintiff, the cause was submitted without argument, and without any request by petitioner's counsel for delay, and a judgment was thereupon rendered in favor of said plaintiff, as stated in said petition.

" 5. That at no time was any showing made by petitioner or its attorneys of any effort being made to secure the attendance of said Murphy as a witness, either by the issuing of subpœna or otherwise; nor was any cause shown or stated why the petitioner was unable to secure his attendance upon the day when said cause was tried.

" 6. That it satisfactorily appeared from the evidence in the case that the said Murphy had an account at said bank in his own name, individually, and that there was at the time no account at said bank with said Murphy as 'president,' or with said ' Murphy, Pt. ;' nor was there any account at said bank in the name of said petitioner.

'' That the account of said Murphy with said bank was opened on the twenty-third day of August, 1886, the pass-book being in his own name, and that he had from time to time deposited considerable sums of money to said account, drawing against the same by checks in his own name, and that no claim was made that any of the moneys in said account belonged to any other person until after the service of said writ of garnishment.

" That soon after said writ was served said Murphy called at said bank, and asked to see the deposit slip which accompanied the deposit of the $1,813.36; that said slip was in said Murphy's own name, individually, and in his own handwriting; that upon receiving said slip from the bank, and subsequent to the service of said writ of garnishment, he surreptitiously changed the same by adding the letters ' Pt.,' so as to make it read, ' S. A. Murphy, Pt.,' and folded the slip in such a way as to conceal the change which he had made, and that said change was discovered by the book-keeper of said bank immediately after said Murphy had left the bank, and that said book-keeper reported the same to the president of the bank.

" 7. It is true, as stated in said petition, that a motion for a new trial was made therein, and that the petitioner, in support of said motion, presented the affidavits attached to said petition, and that there were also presented, in opposition to said motion, by plaintiff's attorneys, certain affidavits, copies

of which are hereto annexed, marked 'Exhibits E, F, and G;' and that, it appearing to the court from said affidavits, and from all the facts and circumstances, that the petitioner could, by the exercise of ordinary diligence, have secured the attendance of said Murphy as a witness at the trial of said cause, but had failed to do so, or make any proper effort to that end, and that justice between the parties would be promoted by denying said motion, said motion for a new trial was denied.

"Respondent submits that the refusal to grant said motion for a new trial was a proper exercise of discretion on his part, and that the prayer of said petitioner should be denied.

"GEO. GARTNER, Circuit Judge.

"*Dated Nov. 27, 1888.*"

The following are the affidavits against the motion, omitting the entitlement of the case:

"STATE OF MICHIGAN, } *ss.*
  County of Wayne,  }

"Hercules Desallier, being duly sworn, says that he is acquainted with the defendant, Samuel A. Murphy, and has known him since the seventeenth day of April last.

"That since the eighteenth day of April he has been employed as watchman on vessels in which said Murphy claims to be interested, including the tug 'Gladiator,' 'the Chamberlain,' the schooner 'Johnson,' lying at or near Beaubien's dock, or the dock next above Beaubien's, in Springwells; that on Saturday, the seventh day of July, he was acting as watchman on the schooner 'Johnson,' lying at said dock; that the scow or barge 'Grace Amelia' was being fitted out at that time by said Murphy for Toledo, she being the vessel referred to in an affidavit made in this cause on the ninth day of July by said Murphy, which has been read to deponent; that said barge lay immediately astern the 'Johnson,' on which deponent was acting as watchman, and from which some of the canvas and other outfit was removed to be put on board the 'Grace Amelia.'

"That the deponent saw the men at work, and knows who were there on board and about the 'Grace Amelia' during the forenoon of said Saturday, and that he knows said Murphy was not there during the forenoon, nor was he there until about 7 o'clock of the evening of that day; that deponent saw him when he came (he driving there in his buggy),

and that he also saw him when he went away, and that he was not there more that about fifteen minutes.

"Deponent feels confident that, had said Murphy been about said scow or barge, or at work in fitting her out as stated in his affidavit, deponent would have seen him there.

"H. DESALLIER.

"Subscribed and sworn to before me this fourteenth day of July, 1888.

"JULIA LINCOLN,
"Notary Public, Wayne Co., Mich."

"STATE OF MICHIGAN, } ss.
County of Wayne,

"Samuel Murdock, being duly sworn, says that he is personally acquainted with Samuel A. Murphy, and has known him for about two years, and has sailed as a vessel master for him for more than one year; that deponent is now the master of the propeller Chamberlain, in which said Murphy is, or claims to be, interested.

"That on Saturday, July 7, 1888, deponent saw said Murphy on Griswold street in the city of Detroit, between the hours of 9 and 10 o'clock in the forenoon of said day; that said Murphy, when deponent so saw him, was near the corner of Larned street, on Griswold street, and was then going towards Jefferson avenue. Deponent saw him at the Woodward avenue ferry at about 6 o'clock in the afternoon.

"SAM'L MURDOCK.

Subscribed and sworn to before me, this fourteenth day of July, 1888.          JULIA LINCOLN,
"Notary Public, Wayne Co., Mich."

"STATE OF MICHIGAN, } ss.
County of Wayne,

"G. Russell Jenkins, being duly sworn, says that since the trial of the above-entitled cause he has examined the books of the said First National Bank for the purpose of ascertaining what accounts were kept at said bank in which said Murphy was interested, and that the only accounts in which his name in any manner appears during the years from 1879 to 1888, inclusive, are the following:

ACCOUNTS.

| | |
|---|---|
| S. A. Murphy. | Opened June 19, '82; Dec. 31, '85; Aug. 23, '86; Sept. 30, '87.<br>Closed Dec. 11, '85; July 29, '86; Sept. 23, '87.<br>Still open. |
| S. A. Murphy, Pt. | Opened Dec. 28, '87; Feb. 7, '88.<br>Closed Jan 19, '88. Still open. |
| S. A. Murphy, Tr. | Opened ——.<br>Closed Mch. 11, '79. |
| T. & S. A. Murphy. | Opened Aug. 17, '83.<br>Closed Aug. 25, '83. |

"He further says that if he stated, as a witness, upon the trial of said cause, that there was an account at said bank in the name of S. A. Murphy, Pt., or S. A. Murphy, president, such statement was erroneous; that his subsequent examination of the books of said bank shows that the account of S. A. Murphy, Pt., was not opened until December 28, 1887.

"G. RUSSELL JENKINS.

"Subscribed and sworn to before me on this fourteenth day of July, A. D. 1888.

"JULIA LINCOLN,
"Notary Public, Wayne Co., Mich."

"STATE OF MICHIGAN, }
County of Wayne, } ss.

"H. P. Strong, being duly sworn, says that at the request of Moore & Canfield, attorneys for the plaintiff in the above entitled cause, he carefully examined the 'Annual Reports of Corporations' in the office of the county clerk for the county of Wayne, for the purpose of finding the annual reports of the Detroit Tug & Wrecking Company, a corporation having its office in Detroit, and that he found no such reports on the files for the years 1885, 1886, 1887, and 1888.

"H. P. STRONG.

"Subscribed and sworn to before me this twenty-first day of July, 1888.

"GEO. L. CANFIELD,
"Notary Public, Wayne Co., Mich."

"At the request of counsel for relator, I hereby certify, by way of further return to the order to show cause in this cause, that at the close of the trial before me of the cause referred to in my return, and after the judgment had been pronounced, counsel for the said relator asked for five days in which to enter a motion for a new trial, and for a stay of proceedings

in the meantime; that no objection was made by counsel for the plaintiff to the extension of time.

"And as to the stay of proceedings, counsel for the plaintiff in open court stated that no execution would be issued during the time asked for in which to move for a new trial, and the following memorandum was entered upon the short book by the clerk :

"'Judgment for plff. for $984.65; gar. deft. allowed $25.00 att'y fee. Proceedings stayed till July 16, 1888.'

"All of which is respectfully submitted.

"GEORGE GARTNER,
"Circuit Judge."

The return refers to certain affidavits filed by the petitioner upon the motion for a new trial. Those affidavits are as follows :

"STATE OF MICHIGAN, }
County of Wayne, } ss.

"Samuel A. Murphy, being duly sworn, deposes and says that he is, and for more than a year last past has been, the president of the Detroit Tug & Wrecking Company, and as such has had the principal charge of the finances of the company; and in his absence the finances have been in charge of Mr. Thomas Murphy, his brother, who is, and continually for one year and more last past has been, the treasurer of said company.

"That the stockholders of said company are now, and for more than a year last past have been, as follows: William J. Murphy, holding $21,000; Thomas Murphy, holding $2,000; and this affiant, holding $2,000,—of said stock, the total stock being $25,000.

"Deponent further says that, during the latter part of the season of navigation of the year 1887, the tug Gladiator, with two steam-pumps, all belonging to the Detroit Tug & Wrecking Company, released the propeller Albany from Bois Blanc Island reef, and towed her to Duncan City, for which it was allowed by the owners of said propeller Albany between $1,850 and $1,900.

"The claim was settled a few days before December 15, 1887, and, after making some deductions, amounting in the neighborhood of $50 or $60, the bill was finally paid at the sum of $1,813.86, for which a draft was given by the manager of the propeller Albany to the Detroit Tug & Wrecking

Company, and the said draft was delivered to the deponent, as the president of said company, and this deponent took said draft on or about the fifteenth of December, 1887, to the First National Bank of Detroit, and deposited the same for collection.

"No part of said money belonged to this deponent, and this deponent had no authority to deposit said money to the credit of any other person or corporation except said Detroit Tug & Wrecking Company.

"After said draft was received as aforesaid this deponent took the same to the First National Bank, and by inadvertence deposited the same in his own name without the addition of the letters 'Pt.,' and drew a number of checks against said money for the purpose of paying the debts of the said Detroit Tug & Wrecking Company, to whom all of said money belonged.

"After the balance of said money remaining in the bank had been garnished by Henry McMorran, this deponent went to the bank to ascertain whether in the deposit slip he had added the letters 'Pt.' after his name, which would indicate that the money was deposited by him as president of the Detroit Tug & Wrecking Company, and was their money. Upon examining this slip this deponent discovered that he had omitted to put these words after his name, and he immediately added the same to his name, as he thought he had a right to do, and also notified the bank at once that the money did not belong to him, but belonged to the Detroit Tug & Wrecking Company.

"Deponent further says that he has been anxious to have this case tried, because nearly $1,000 of the company's money was tied up by the garnishee in this case, and he has urged the company's attorneys several times to hasten the hearing. When this case was first called for hearing this deponent was in Buffalo, and asked them to postpone the case for one day.

"Deponent went to Buffalo, and returned the next day, ready to try the case, but it was postponed beyond the following day. On Thursday morning last this deponent had arranged to go to Buffalo, and notified the company's attorneys of that fact, and requested them not have the case passed. He was anxious to try it. After leaving the office of Moore & Moore, attorneys for said wrecking company, this deponent found that he was not compelled to go to Buffalo, but to Chicago, where he arrived Friday morning. Deponent remained there Friday, and arrived again in Detroit Saturday morning, and immediately after his arrival

was very busily engaged in getting a boat fitted out for Toledo from a dock in Springwells, and remained at said work until about 9 o'clock P. M. Deponent heard nothing further from the attorneys of the wrecking company, and did not understand that the case would be called on Friday or Saturday; that, if such information was given him at the office of the company's attorneys, he misunderstood it.

"Deponent further says that, had he known that said cause would be tried on Friday or Saturday morning, he would either have been here or sent to this court a statement under oath of why he was unavoidably detained, if he was so detained.

"Deponent further says he understands a telegram was sent to him at Buffalo on Friday last, but said telegram was never received by this deponent.

"Deponent further says that he can be present next Monday, July 16, at 2 o'clock P. M., as a witness in this cause, and will be ready and willing to give his testimony at that time.

"S. A. MURPHY.

"Subscribed and sworn to before me this ninth day of July, A. D. 1888.

"ROBERT ATKINSON,
"Notary Public, Wayne County, Michigan."

"STATE OF MICHIGAN, ⎱ ss.
County of Wayne, ⎰

"Thomas Murphy, being duly sworn, deposes and says he is treasurer of said Detroit Tug & Wrecking Company, and has been continually for more than a year last past; that during all of that time, and before, the tug 'Gladiator' belonged to said company; that he knew of the fact that said tug released the propeller 'Albany' from Bois Blanc Island reef and towed her to Duncan City towards the close of the navigation season of 1887, for which said Detroit Tug & Wrecking Company received, after making some minor deductions, the sum of $1,813.86, and said money should have been deposited in the bank to the order of the company.

"That S. A. Murphy, president of the company, was not authorized at any time to deposit that money, or any other money belonging to the Detroit Tug & Wrecking Company, in his own name in the First National Bank of Detroit, or any other bank, and this deponent did not know that said money was so deposited in the individual name of said S. A. Murphy until after the garnishee process was issued and

served in this cause. Deponent did not know the facts and circumstances under which said money was deposited by said S. A. Murphy in his own name, but this deponent does know that S. A. Murphy was not authorized so to do.

"Deponent further says that on Friday, July 6, he understood and believed that the said S. A. Murphy was in Buffalo, N. Y., and this deponent received from Moore & Moore, attorneys for said wrecking company, notice that this cause would be tried the following morning, and this deponent, believing said S. A. Murphy was in Buffalo, N. Y., telegraphed said S. A. Murphy in words and figures as follows, to wit:

"'DETROIT, July 6, 1888.

"'To S. A. MURPHY, Mansion House,
    "'Buffalo, N. Y.:

"'Moore & Moore have got case put over to Saturday morning, but must come to trial then.

"'THOMAS MURPHY.'

"Deponent believed that the above dispatch would reach said S. A. Murphy; and this deponent, who is the proprietor of the Murphy Iron Works, went to Chicago on Friday night on business of his own, this deponent not considering it necessary for himself to be present on the trial of this cause, for the reason that this deponent knew only a portion of the facts in the case, and of which said S. A. Murphy also had as full knowledge thereof as this deponent; and besides, said S. A. Murphy had personal knowledge of the collecting and depositing of said $1,813.86, and the circumstances under which the same was deposited, of which this deponent had no personal knowledge, because this deponent was not present when the money was paid or when the money was deposited.

"THOMAS MURPHY.

"Subscribed and sworn to before me this twelfth day of July, A. D. 1888.

"ALEXANDER G. COMSTOCK,
"Notary Public, Wayne County, Michigan."

It is not claimed by counsel for relator that the Detroit Tug & Wrecking Company is entitled to a new trial as a matter of right; nor is it pretended that the judgment which was rendered in the court below was not properly rendered upon the facts and law of the case. They admit their negligence in not being at the trial with their witnesses, but ask

under their affidavits, in which they attempt to excuse their negligence, that the judgment may be set aside and a new trial awarded them as a matter of favor, expressing their willingness to submit to any terms which the court may impose as a condition of granting the favor. The motion, then, was not based upon a legal right, but was addressed purely and entirely to the discretion of the trial judge. In granting or refusing the motion the circuit judge exercised a judicial discretion, based upon testimony bearing upon the fact as to whether the wrecking company had sufficiently excused its negligence, and about which there was conflict in the affidavits. The history of judicial proceedings does not furnish a case where, under such circumstances, a court of last resort has held that the trial judge abused his discretion when he has decided without malice and according to the best of his ability upon the weight of the testimony.

It is true that the Constitution has given this Court a general superintending control over all inferior courts, but in the exercise of this jurisdiction it has never been claimed that this Court can substitute its discretion for that of the inferior tribunal, and compel it to exercise and enforce our discretion, and not theirs. This Court has uniformly held that it has no authority to review the discretion of trial courts in granting or refusing new trials. *Dibble v. Rogers,* 2 Mich. 404; *People v. Branch Circuit Judge,* 17 Id. 67; *People v. Wayne Circuit Judge,* 20 Id. 220; *Greeley v. Stilson,* 27 Id. 153; *Johr v. People,* 26 Id. 426; *People v. Saginaw Circuit Judge,* 39 Id. 123; *Mabley v. Superior Judge,* 41 Id. 32; *Mahoney v. People,* 43 Id. 39 (4 N. W. Rep. 546); *People v. Francis,* 52 Id. 576 (18 N. W. Rep. 364); *Gray v. Barton,* 62 Id. 186 (28 N. W. Rep. 813).

Six of the cases above cited came before this Court upon applications for *mandamus.*

In *People v. Branch Circuit Judge,* which was an application for *mandamus,* this Court said:

" We are of opinion that there was not an entire failure of any showing, but, on the contrary, there was something upon which the circuit judge was called upon to exercise his judgment; and, that being so, the question whether a new trial should be granted is one addressed to his discretion, *and the Supreme Court has no authority to review his conclusion, and compel him, by mandamus, to rescind his order.*"

In *People v. Wayne Circuit Judge,* this Court said:

"As the motion was properly before the court below, we cannot review its decision on the facts so as to decide whether the new trial should have been granted. *It was a matter of discretion, where the action of that court is not open to review.*"

In *People v. Saginaw Circuit Judge,* this Court held that " *Discretion is not reviewable on mandamus.*"

In *Mabley v. Superior Judge,* a *mandamus* was asked to compel the superior court of Detroit to vacate an order setting aside a previous conditional order for a new trial. CAMPBELL, C. J., said:

" As we have no jurisdiction by *mandamus* to review the discretionary action of courts in such cases as that before us, we cannot grant the writ."

In *Mahoney v. People,* Mr. Justice GRAVES said :

"The refusal of the court to grant a new trial presents no question. \* \* \* The application for the new trial was founded on matters pertaining to the discretion of the court, and not on the ground of absolute legal right."

In *People v. Francis,* Mr. Justice SHERWOOD said:

" We are not permitted to review the discretion of the circuit judge on a motion for a new trial."

In *Gray v. Barton,* Gray had moved for a new trial, which was denied. He then applied to this Court for a *mandamus,* and set forth facts by affidavit which certainly appealed for the exercise of our authority to interfere far stronger than the Detroit Tug & Wrecking Company has done in this case; but his application was refused, and he then filed a bill for the purpose of obtaining a new trial upon several

grounds, one of which was newly-discovered evidence, and that the judgment was contrary to justice. Mr. Justice MORSE, speaking for the Court, said:

" Complainant has hardly shown sufficient diligence in this respect to entitle him to a new trial in a court of law upon the ground of newly-discovered evidence.   *   *   *   Equity will not relieve a party against a judgment at law on the ground of its being contrary to justice, unless the defendant was ignorant of his defense pending the suit, or facts could not be received as a defense at law, *or unless, without any neglect or default on his part,* he was prevented by fraud or accident, or the act of the opposite party, from availing himself of his defense."

Now, what were the facts presented to the circuit judge upon the motion for a new trial?   Briefly stated, they were that the Detroit Tug & Wrecking Company was a corporation composed of three corporators.   Samuel A. Murphy was president; Thomas Murphy was treasurer.   Under the statute these three corporators must have constituted its board of directors, who had the control and management of its business.   The president and treasurer represented the company.   The corporation was a party to the record, but Thomas and Samuel Murphy were its representatives, and, for all purposes of appearing in court or prosecuting the suit, must be regarded as the active, responsible parties.   They were the only persons authorized to, or who could, look after its interests, and, so far as the merits are affected, they must be regarded as the actual parties contesting the suit.   Their acts and negligence must be regarded as the acts and negligence of the corporation.   It was their duty to see that the case of the corporation was prepared for trial.   If they were witnesses, it was their duty to attend, equally as if they were the actual parties.   No service of subpœna could add to their duty to be present.

The cause was regularly set for trial on Friday, the twenty-ninth day of June, 1888, and was postponed until July 6 upon the application of the attorneys for the com-

pany. The plaintiff at that time came from a distance with his witnesses to attend the trial, and was ready to proceed, and, as Samuel A. Murphy was not present, at the request of the attorneys for the company it was postponed until the next day. The next day the cause was called, and the said attorneys then stated to the court that they had given said Murphy notice, and they were in no position to ask for further indulgence or further delay, and made no request for any further postponement or further delay, in the trial, but they proceeded with the trial without objection, and cross-examined witnesses for the plaintiff.

It does not appear that any suggestion was made that either of the Murphys were witnesses in the case, or that they were desired as such. But in his affidavit for a new trial Samuel Murphy states that he is willing to be present as a witness and give his testimony. He may be regarded, then, in the light of a party who expects to establish his case by his own testimony.

The showing made by the two Murphys in their affidavits to excuse their negligence is very unsatisfactory, and to my mind insufficient. That of Samuel A. Murphy is especially evasive and indefinite upon material points. There is no dispute that the case was first set for trial on Friday, the twenty-ninth day of June. Was this the day Murphy swears he was in Buffalo? If it was, he says he went to Buffalo and returned the next day, ready to try the case, but it was postponed beyond the following day. He evades saying when it was postponed to. The return shows that it was postponed to the sixth of July, being one week. Did he know that the trial was set for July 6? He evades the admission of this fact, yet his attorney stated in open court that he had notified him of the fact, and it is a plain inference from the affidavit that he perfectly understood that it was set for trial that day, for he says that on Thursday morning he—

"Arranged to go to Buffalo, and notified the company's attorneys of that fact, and requested them not to have the case passed. He was anxious to try it."

But instead of going to Buffalo he went to Chicago, arriving there Friday morning. He took no steps to notify his attorneys of his change of destination, but paid no further attention whatever to the case he was so anxious to try.

He returned home and arrived in Detroit Saturday morning, but made no inquiry of his attorneys or others as to what had become of the case which he requested them not to have passed on Friday, and which he was so anxious to try, but, according to his statement, went about his own business or the business of the company, doubtless considering it of more importance than the business of the court. He says he heard nothing further from his attorneys, and did not understand that the case would be called on Friday or Saturday. He certainly did not understand that it would not be called on Friday or Saturday. He had given orders not to have it passed. This president of the company gives us to understand that through his orders not to have the case passed his attorneys would hold the business of the court in abeyance, and the opposite party and his witnesses dancing attendance, while he was attending to his own or the company's business until he found leisure to attend the trial. He says—

"That, if such information was given him at the office of the company's attorneys, he misunderstood it."

There was no misunderstanding about it. He understood the case was set for Friday, and he requested the attorneys *not to have it passed*. They gave him no information that it would be called Saturday.

It is quite evident from the return that he did not inform his attorneys that he was going to Buffalo. They expected him to be present at the trial, and, because he was not, asked a postponement one day. They evidently made inquiries, and gave notice to Thomas Murphy, the treasurer of the

company, as appears from the dispatch sent by him to Buffalo. Whose fault was it that the dispatch was not received? It was Samuel A. Murphy's, the president of the company. If he had intended to delay the case, and prevent it from coming to trial on the ground of an absent witness, and compel Mr. McMorran to again bring his witnesses from Port Huron, he could not have acted more effectually to accomplish such result, if his attorneys could have held the case open on his account.

The affidavit of Thomas Murphy shows that he, too, was an important witness. He knew that the president was absent, and, instead of attending the trial, he, too, on Friday night, went to Chicago *on his own business.*

So it appears that this president and treasurer of the corporation regarded their own business of more importance than proceedings in court of which they had full control. It does not help the case to call these persons merely witnesses. If they were merely witnesses the corporation was inexcusably negligent in not having secured their attendance by subpœna. Courts have uniformly refused to grant new trials when such negligence appears.

In the case of *People v. Saginaw Circuit Judge,* this Court held that the discretion exercised by a circuit judge in opening a judgment by default was like the discretion exercised in granting a new trial.

In *Hays v. Bank of the State,* 21 Ind. 154, it was held that pressing business engagements were not sufficient excuse, on a motion to set aside default.

In *Macomber v. Mayor, etc.,* 17 Abb. Pr. 36, it was held a default should not be set aside unless there was a meritorious defense, *and* the omission was the result of accident or mistake without culpable negligence.

In *Jarvis v. Worick,* 10 Iowa, 29, it was held that a default will not be set aside when the defendant's excuse really admits a want of diligence in preparing his case. See, also,

*Edwards v. McKay*, 73 Ill. 570; *Leather Co. v. Woodley*, 75 Id. 435; *Schroer v. Wessell*, 89 Id. 113; *Thatcher v. Haun*, 12 Iowa, 303.

A plainer case of fault and inexcusable negligence on the part of a party having control of a cause in court cannot well be imagined.

Besides, the facts upon which Samuel A. Murphy seeks to exculpate himself are contradicted in material points by the affidavits of two persons. The circuit judge was called upon to pass upon and weigh the evidence produced before him upon the motion, and, when *that* is the case, courts exercising a supervisory jurisdiction have hitherto refused to interfere by *mandamus* with the discretion of the trial court.

In *King v. Justices of Devon*, 1 Chit. 34, the court refused to compel a quarter sessions to enter continuances, saying:

"Although our powers are great, they are not unlimited; they are bounded by some lines of demarcation. I am not aware that we have any power to interfere with the jurisdiction of the court below in the way suggested."

In the case of *King v. Justices of Middlesex*, 4 Barn. & Ald. 300, Abbott, C. J., said:

"There is not an instance which can be cited where the court have granted a *mandamus* to justices to compel them to come to any particular decision."

So, in *U. S. v. Judge Lawrence*, 3 Dall. 42, which was an application for a *mandamus* to compel Judge Lawrence to issue a warrant to apprehend Captain Barre, the Supreme Court of the United States said:

"We are clearly and unanimously of opinion that a *mandamus* ought not to issue. It is evident that the district judge was acting in a judicial capacity when he determined that the evidence was not sufficient to authorize his issuing a warrant for apprehending Captain Barre, and (whatever might be the difference of sentiment entertained by this Court) we have no power to compel a judge to decide according to the dictates of any judgment but his own."

And in *Ex parte Hoyt,* 13 Pet. 279, 290, Mr. Justice Story, speaking for the Court, said:

" It has been repeatedly declared by this Court that it will not by *mandamus* direct a judge what judgment to enter in a suit, but only will require him to proceed to render judgment."

In *Insurance Co. v. Adams,* 9 Pet. 602, Chief Justice Marshall cites with approval the language made use of in the opinion given in the same case, reported in 8 Pet. 291, viz.:

" On a *mandamus* a superior court will never direct in what manner the discretion of an inferior tribunal shall be exercised ; but they will, in a proper case require the inferior court to decide."

To the same effect are: *Com. v. Judges, etc.,* 3 Bin. 273 ; *Com. v. Cochran,* 5 Id. 103 ; *Roberts v. Holsworth,* 10 N. J. Law, 58 ; *County Court v. Daniel,* 2 Bibb, 573 ; *Chase v. Canal Co.,* 10 Pick. 244.

The cases in which this principle is asserted might be extended almost indefinitely from the earlier cases above cited to the present time, embracing the courts of every state and country exercising jurisdiction over English speaking people.    It seems to me that if all of our own decisions upon this question are to be overruled, and the principles so universally and uniformly declared and acted upon by other courts are to be disregarded, the inconveniences and mischiefs of introducing and acknowledging this practice ought to have some weight in inducing us to stand by our former decisions.

This Court is not instituted for the purpose of investigating facts in cases at law; nor is it a court of original jurisdiction in equity.    If the application for a *mandamus* to compel a circuit judge to grant a new trial can be entertained in this Court, it will be no longer necessary to resort to bill in equity for that purpose, and we will find ourselves investigating facts and weighing evidence as a court of original juris-

diction in order to review and reverse the judgment of a trial court, a practice never contemplated and never authorized by the Constitution and laws of this State.    If this Court assumes the authority to correct and overrule the discretion of the inferior tribunals in the granting or refusing of new trials, it is difficult to perceive why every case may not be reviewed upon *mandamus.*

There is nothing peculiar in the circumstances of this case, unless it be the confessed fault of the petitioner in not being at the trial, that distinguishes this case from any other when a new trial is desired, and the result would be that this Court would be overrun with motions for *mandamus,* and the time of the Court taken up in the disposition of cases where we will measure our discretion with that exercised by the circuit judges; and if we find they are not quite as broad as our own, we will overrule and set them aside.

It is gravely claimed that the circuit judge in this case abused his discretion, and therefore exercised none.    We have seen that there was evidence for him to pass upon, and that the evidence showed a plain case of negligence, for which no sufficient excuse was given; but it is not our province to pass upon the sufficiency of the excuse; that was for the circuit judge to decide.    The exercise of an honest judgment, however erroneous it may be, is not an abuse of discretion.    Simply to assert that a judge has *abused* his discretion is merely to apply an epithet without defining the act.    Advocates of the doctrine of the right to interfere by *mandamus* in matters of discretion usually assert that the abuse must be gross and palpable, so that the decision can be only explained as the result of caprice, passion, or partiality.

No man can review the facts of this case and say with any honesty of intent that Judge Gartner, in denying the motion for a new trial, acted either through caprice, partiality, or passion.    When an exercise of discretion shall be influenced by such causes, and brought to my attention, I shall be ready

to apply the corrective authority which we have to prevent injustice. Until then I must signify my satisfaction with the former decisions of this Court upon the practice.

One other point, not appearing in the record, but urged upon our attention with great force by the attorney of the petitioner, demands a passing notice. While admitting that there was fault upon the part of the company, yet he urged that the judgment of $1,000 was too great a fine to be inflicted on the corporation for the default of its officers. He announced his willingness to pay any reasonable sum imposed as terms, but insisted that $1,000 was too much. While admitting the force of this argument as *tending to influence our discretion* in opposition to that of the circuit judge, and excite our sympathy for his unfortunate client, yet I must suggest that such considerations have no legitimate place in the argument of the question. The fact that a judgment is obtained for or against a party who moves for a new trial has no bearing upon the question whether the judge has abused his discretion in granting or refusing the motion. In *Ex parte Whitney*, 13 Pet. 404, Justice Story said:

"A writ of *mandamus* is not the appropriate remedy for any orders which may be made in a cause by a judge in the exercise of his authority, although they may seem to bear harshly or oppressively upon the party."

These considerations appealed as strongly to the conscience of the Court in the cases of *Miller v. Morse*, 23 Mich. 368, and *Gray v. Barton*, 62 Id. 186 (28 N. W. Rep. 813), where judgments were obtained by fraud and false swearing, as was alleged, for nearly as large and a larger amount than this, and yet this Court refused to grant new trials, notwithstanding, because of the negligence of the parties, which had been passed upon and ruled against them by the trial court.

I think the writ of *mandamus* should be denied.

MORSE and LONG, JJ., concurred with CHAMPLIN, J.

SHERWOOD, C. J.    Henry McMorran obtained a judgment against Samuel A. Murphy in the Wayne circuit, and garnished the First National Bank of Detroit.

The bank filed an answer in the garnishee proceedings, stating at the time the writ was served it had in its possession $984.65, and that petitioner claimed the money.

Petitioner was thereupon ordered by said circuit court to appear and interplead, and complied with the order.    The cause came on for trial in July, 1888.    Murphy was petitioner's main witness, and it failed to secure his attendance, and postponement of the trial was had until the next day, and, petitioner being then unable to produce the witness and make its proofs, judgment was taken against petitioner, and time allowed it to move for a new trial, which motion was duly entered, heard by the court, and denied.

This Court is now asked to issue a writ of *mandamus,* requiring the circuit judge to grant the new trial and set aside the order denying same.

The affidavits accompanying the relator's petition show that S. A. Murphy was the president of petitioner; that the money in the bank garnished was owned by relator, and should have been deposited to its credit, at the time the writ of garnishment issued.

It further appears from the affidavit of S. A. Murphy that defendant was anxious to try said cause, and that the reason the witness was not present to give his testimony when the cause was tried was because of his not receiving telegrams from his attorneys, and a misunderstanding between him and them as to the time when it would be necessary for him to be in court.    This fact is not denied by the answer of the respondent.

If what is stated in the petition and accompanying affidavits, and not denied by the respondent, is true, the judgment against the petitioner ought never to have been rendered, and it should not be deprived of the right to make such show-

ing upon a trial of the case, where it may be permitted to give all its testimony in evidence, unless it has wantonly or contemptuously abandoned the cause, which does not appear to have been done in this case.

I think the circuit court should have granted, upon proper terms, the petitioner's motion for a new trial, and the *mandamus* ought to be granted as prayed, but upon the terms of payment of costs in this Court and at the circuit to the present time.

It is said that a new trial in this case was not a matter of right, but was within the discretionary power of the circuit court; that the circuit judge exercised that discretion, and that this Court cannot now review it; that such is the tenor of all the decisions in this country and in England; and that to hold otherwise would not only necessitate the overruling of all the decisions upon the subject, but would bring into this Court a class of cases never before known in courts of last resort, exercising only an appellate jurisdiction.

This is clearly a mistake, and no other authorities need be cited than those referred to in my Brother CHAMPLIN'S opinion given in this case.

The discretion vested in the circuit court in this matter is a legal one, as all the authorities concede. Now, what is understood by legal discretion? Certainly it is not an arbitrary one. When exercised arbitrarily by a court it becomes an abuse of legal discretion. It must be conceded that the circuit court has no right or power to exercise its discretion in any such way, and whenever it does it is the right of any injured party to have the case reviewed in the appellate court, and have the injustice corrected.

A legal discretion is one that is regulated and governed by well-known and established principles of law. It can never be used or invoked to destroy nor to deprive a party of his property rights. Those are absolute, and no court is vested with the power to destroy these, nor to deprive a party of

them, except as public necessity may require; and that is not this case.

Legal discretion can only be exercised in securing to a party his absolute rights and in their protection in some way; and when the discretion of a court is used for any other purpose, it becomes arbitrary and oppressive, and can never be regarded when so used as anything but an abuse of discretion, which is itself a violation of the law, both tyrannical and intolerable.

Where a party by a suit in a court seeks to enforce any of his absolute rights, or when such rights are assailed in a court of justice, and he has been summoned in to protect them, and he has not taken the proper means for such purpose, or if such means have been resorted to, and he has been negligent in enforcing them, the court cannot impose, as a penalty for such mistake or neglect, the destruction of such rights in granting relief, but may subject the careless or negligent party to such reasonable terms as will save the adverse party harmless in the premises, and at the same time save to the former his rights that are being enforced or protected if attacked, and in doing this the court may exercise a reasonable discretion, but beyond this the court cannot go, without subjecting his action to review in the appellate court. It cannot assume, in addition to the power thus given, the right to destroy or withhold the very right the discretionary power was given to enforce or protect.

Any other rule than the one herein indicated would place the absolute rights of every individual, when an attempt is made to enforce or protect them in a court of justice, at the arbitrary will or caprice, it may be, of the judge who may at the time be hearing the case. I know of no case recognized as law going so far, and if one can be found I have no hesitation in saying its authority should be disregarded. If what is claimed in this record on the part of the relator is true, and for the purpose of disposing of the question raised it

must be so regarded, by the action of the circuit judge, relator has been irrevocably deprived of its property to the extent of over $1,000, if that action is to stand, and this, we are told, is no more than the exercise of a sound, legal, discretion, arbitrarily conferred upon the circuit judge. With my understanding of the law I can never give my assent to such a doctrine.

It is not, as is supposed, the right to the $1,000 that relator asks as favor of the court to protect. This it demands as its right. But the favor it asks of the court, and which the court has the discretionary power to grant, is that the terms to be imposed for its neglect in making good its defense at the first opportunity presented shall not exceed those necessary to save harmless the opposite party, and upon these terms I think the motion for a new trial should be granted, and that the writ should issue to that effect.

CAMPBELL, J. If the policy of this State had not become fixed in favor of resorting to motions for new trial in all cases, in preference to bills in equity, there would be force in the suggestion that the remedy should be sought in that way; and it is undoubtedly true that in the cases where equity did not exercise jurisdiction, and which usually involved a knowledge in the circuit judge depending on his attendance upon the trial, and seeing and hearing witnesses, and obtaining an acquaintance with matters not as well intelligible by others, the exercise of his discretion cannot generally be reviewed. But when a bill in equity would lie, its decisions were appealable as in all other cases, and to compel a party to resort to a motion, and then deny him resort to an appeal, would be to deprive him of a valuable right. This case is one which would come within the jurisdiction of equity, had that jurisdiction been retained, and, this being so, I think this Court has power to review it, and *mandamus* is the only remedy for that purpose.

I concur with the Chief Justice.