MULHOLLAND v DEC INTERNATIONAL CORPORATION

Docket No. 81545. Argued October 5, 1988 (Calendar No. 6). Decided June 6, 1989.

Robert and Betty Mulholland and others brought a products liability action in the Montcalm Circuit Court against DEC International Corporation and Tommy's Refrigeration Service, alleging breach of warranty and negligence in the design and manufacture of certain milking machinery, and failure to warn which resulted in contraction of mastitis by their dairy cows. During trial, the court, James L. Banks, J., ruled that the plaintiffs' expert lacked the necessary qualifications to express an opinion as to the cause of mastitis in the herd because he was not a licensed veterinarian. The Court of Appeals, MAC-KENZIE, P.J., and WEAVER and J. E. ROBERTS, JJ., affirmed in an unpublished opinion per curiam (Docket No. 85573). The plaintiffs appeal.

In an opinion by Justice BOYLE, joined by Justices LEVIN, CAVANAGH, and ARCHER, the Supreme Court held:

The trial court erred in ruling that the plaintiffs' expert was not qualified to give an expert opinion as to the cause of mastitis in the plaintiffs' herd of dairy cows; the plaintiffs' proofs were sufficient to survive the defendants' motion for a directed verdict.

1. The qualification of an expert to render an opinion is a matter which rests in the discretion of the trial court. An expert may be qualified by virtue of knowledge, skill, experience, training, or education. While a license may be evidence of expertise, it is not a qualification in itself and is not required of an expert witness. The only safe rule is to ascertain with some specificity the range of the expert's qualifications and to permit testimony within that range. In this case, although the plaintiffs' expert lacked formal training in the area of mastitis, his

REFERENCES

Am Jur 2d, Expert and Opinion Evidence §§ 26-28, 30, 31, 36-44; Products Liability §§ 260-272.

Products liability: Admissibility of expert or opinion evidence that product is or is not defective, dangerous, or unreasonably dangerous. 4 ALR4th 651.

studies and experience in the area are extensive. He was not simply a well-qualified expert, but perhaps the outstanding expert in this particular area. He was not called upon to diagnose mastitis, but rather to give an opinion as to the relationship between a particular milking machine defect and the disease. Beyond a doubt, his testimony would have assisted the trier of fact in deciding the cause of the mastitis. Because there was no basis in law or fact for the trial court's ruling, it must be concluded that the ruling was an abuse of discretion.

2. In addition to the qualification of an expert witness, there must be facts in evidence to support the opinion testimony of the expert. Such facts may be perceived by or made known to the expert at or before the hearing. In this case, the expert's perceptions at the Mulholland farm provided ample basis for the conclusion that a defective milking machine caused the mastitis in the plaintiffs' herd by making the cows more susceptible to infection. A lack of evidentiary basis for the conclusion is not an adequate alternative ground upon which to uphold the ruling of the trial court in this instance.

3. A prima facie case for products liability, under either a negligence or warranty theory, requires proof of a causal relationship between the defect and the damage of which the plaintiff complains. On a motion for directed verdict, the question is whether it is reasonable to infer from the evidence, direct or circumstantial, that the damage was probably caused by a defect attributable to the manufacturer. The plaintiff need not offer evidence which positively excludes every other possible cause. It is enough that the plaintiff establish a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, though other plausible theories may also have evidentiary support. Viewing the evidence, particularly the voir dire testimony of the plaintiffs' expert in a light most favorable to the plaintiffs, a sufficient causal relationship between the defendants' system and the increase of mastitis would have been proven. The trial court further erred in directing a verdict for the defendants.

Reversed and remanded.

Justice GRIFFIN, joined by Chief Justice RILEY and Justice BRICKLEY, dissenting, stated that the decision to qualify a witness as an expert is a matter for the discretion of the trial court and that its decision should not be reversed absent an abuse of discretion. In this case, the plaintiffs' expert admitted that he had received very limited formal education relating to mastitis and that he had little practical experience or specialized training in connection with that disease. In light of the witness' admissions, it was not inappropriate for the trial judge

to consider that the witness lacked the credentials of a licensed veterinarian and should not be faulted for taking those standards into account. The trial judge's ruling was sound, particularly in light of undisputed record evidence that the mastitis in the plaintiffs' herd may have been related to one or more of a number of causes. If the abuse-of-discretion standard is to have meaning, there must be room for some difference in judgment. Since this question presented a close call, the trial judge's decision is entitled to deference.

1. WITNESSES — EXPERTS — LICENSES.

The possession of a license is not a prerequisite for the qualification of an expert; an expert may be qualified by virtue of knowledge, skill, experience, training, or education; before permitting expert testimony, a trial court must ascertain with some specificity the range of the expert's qualifications and permit testimony only within that range (MRE 702, 703).

2. PRODUCTS LIABILITY — CAUSAL RELATIONSHIP — DIRECTED VERDICT.

A prima facie case for products liability, under either a negligence or warranty theory, requires proof of a causal relationship between a defect and the damage complained of; to defeat a defendant's motion for a directed verdict, a plaintiff need not offer evidence which positively excludes every other possible cause; it is enough to establish a logical sequence of cause and effect, permitting a reasonable inference from the evidence, direct or circumstantial, that the damage was probably caused by a defect attributable to the manufacturer.

3. WITNESSES — EXPERTS — FACTUAL SUPPORT.

There must be facts in evidence to support an expert witness' opinion testimony; such facts may be perceived by or made known to the expert at or before the hearing (MRE 702, 703).

*Miller, Johnson, Snell & Cummiskey* (by *Edward R. Post*) for the plaintiffs.

*Bremer, Wade, Nelson & Alt* (by *William M. Bremer* and *Phillip J. Nelson*) for defendant DEC International Corporation.

*Mika, Meyers, Beckett & Jones* (by *Douglas A. Donnell*) for defendant Crawford.

BOYLE, J. Two issues are raised in the plaintiffs'

appeal from the directed verdict in their product liability action. The first is whether the trial court erred by ruling that plaintiffs' expert, Sidney Beale, was not qualified to give an expert opinion as to the cause of mastitis in the plaintiffs' herd of dairy cows. The second issue is whether the plaintiffs' proofs were sufficient to survive the motion for a directed verdict, with or without Beale's testimony as to the cause of mastitis in the Mulholland herd. We have concluded that both questions must be answered in the affirmative and that this matter must be remanded to the trial court for further proceedings.

I

FACTS

The plaintiffs, Robert and Betty Mulholland, operated a dairy farm in Montcalm County for many years. The Mulholland operation was small. About fifty to fifty-five cows were milked in an old barn. Feed was raised on 140 acres of the farm.

In 1979, the Mulhollands reached an agreement in which two of their sons, Richard and Randy, would return to the farm and the dairy operation would be enlarged to support the three families. According to the plan, the dairy herd would be expanded to two hundred cows by September of 1982. A new barn was also to be built, including a new milking parlor. Finally, a new milking system was to be installed in the barn.

The barn was completed and the new milking system installed in March, 1980. The equipment for the milking system was supplied by defendant DEC International Corporation and installed by defendant Tom Nelson Crawford, doing business as Tommy's Refrigeration Service.

By the time the new barn and milking equipment were operational, the Mulholland herd was already up to seventy-one cows. Additional cows were added to the herd in April and October, 1980, as well as March, 1981. Most, if not all, of the additional cows were purchased from other farms.

Sometime after March, 1980, the Mulhollands observed that their cows were not "milking out." The cows appeared to be uncomfortable and "steppy" or nervous around the milking parlor. On June 1, 1980, the Mulhollands went from two to three milkings each day in an attempt to get the cows to milk out. About that time, they noticed sores beginning to develop on the teat ends of the cows. Increased mastitis, an infection and inflammation of the udder, also was noticed. On July 21, the Mulhollands returned to two milkings each day, but sores continued to develop on the cows' teat ends and mastitis continued to grow in the herd. The milk from infected cows could not be sold.

George Stuewer, a doctor of veterinary medicine, began working with the Mulholland herd after the new, expanded operation began. Dr. Stuewer treated the more acute cases of mastitis, while the Mulhollands themselves treated the milder cases. Dr. Stuewer noted the scabs on the teat ends of the cows, as well as the "pinched" look of the teat ends after the milking cups were removed. He was aware that this condition was associated with milking machine problems. While watching a milking, Dr. Stuewer also observed that the milk was "thrashing" in the machinery, rather than developing a smooth flow. Dr. Stuewer did not profess to be an expert on milking machines. He therefore suggested the Mulhollands consult with Sidney Beale. Dr. Stuewer had previously spoken

with Beale and was impressed with Beale's knowledge of milking machinery.

Sidney Beale was not a veterinarian, but did have a B.A. degree in agriculture with an emphasis in dairy science. Beale began working with milking machines in 1950 and had been employed as a consultant for about ten years. When he arrived at the Mulholland farm in November, 1980, Beale first observed a complete milking of the herd. He too noticed the sore teat ends, mastitis, the fact that the cows were not milking out, and that the milk was thrashing in the milk lines. Beale ruled out other problems in the milking parlor and then concluded that these problems were related to the configuration of the milking machinery. Specifically, Beale concluded that the use of a header in the vacuum lines was causing the thrashing in the lines, thereby pinching the teat ends and preventing the cows from being milked out. Beale did not examine other aspects of the Mulholland operation, but did prescribe changes in the configuration of the machinery which would allow for removal of the header.

The changes prescribed by Beale were implemented by Tommy's Refrigeration Service in December, 1980. Afterwards, Beale, Dr. Stuewer, and the Mulhollands all noted a decrease in mastitis and an increase in milk production in the herd.

The Mulhollands filed suit in February, 1981, alleging a breach of warranty, negligence in the design and manufacture of the milking machinery, and a failure to warn. Extensive discovery followed, and trial commenced on April 16, 1985. In the course of Beale's testimony, counsel for the plaintiff sought to establish a foundation for the witness' testimony as to the cause of mastitis in the Mulholland herd. After a lengthy voir dire, the

trial court ruled that Beale was not qualified to give such an opinion because he was not a licensed veterinarian.

No further proofs were offered by the plaintiffs and the defense counsel brought a motion for a directed verdict. Defense counsel argued that the plaintiffs had not established a prima facie case in that they had produced no evidence that the milking machinery had caused either an increase in mastitis or the consequential decrease in milk production. The trial court agreed and entered an order of directed verdict for the defendants.

The plaintiffs appealed the decision, arguing that the trial court erred in ruling that Beale lacked the necessary qualifications to express his opinion as to the cause of mastitis in the Mulholland herd. Alternatively, the plaintiffs argued that there was sufficient circumstantial evidence of the cause of mastitis to create an issue of fact for the jury. The Court of Appeals, in an unpublished opinion dated August 5, 1987, disagreed, affirming the trial court's decision. We granted leave to appeal on both issues in an order dated March 22, 1988. 430 Mich 857 (1988).

## II

### THE EXPERT TESTIMONY

#### A. THE QUALIFICATIONS OF SIDNEY BEALE

The Michigan Rules of Evidence provide:

If the court determines that recognized scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, train-

ing, or education, may testify thereto in the form
of an opinion or otherwise. [MRE 702.][1]

It is a long-established principle of Michigan law
that the qualification of an expert to render an
opinion is a matter which rests in the discretion of
the trial court. Appellate courts will interfere with
a trial court's ruling in this regard only to correct
an abuse of discretion. *People v Gambrell,* 429
Mich 401, 407; 415 NW2d 202 (1987).

Wigmore notes and endorses the abuse of discre-
tion review standard over trial court rulings as to
the qualifications of experts. 2 Wigmore, Evidence
(Chadbourn rev), § 561, pp 756-759. According to
Wigmore, three considerations underlie the restric-
tive review standard in these matters. First, a
determination of the expert's qualifications in light
of the proposed testimony often involves compli-
cated factual reviews. Second, cross-examination of
the expert is an "ample and sure safeguard."
Third, the matter of qualifications is considered to
be too trifling to warrant appellate review.

The trial court's ruling in this case touched
upon a number of general concerns regarding the
qualification of experts, but ultimately came to
rest upon the matter of licensing. As the trial
court explained:

---

[1] FRE 702 is essentially identical to MRE 702, except for the
opening phrase "If the court determines that recognized . . . ." The
text of FRE 702 provides:

> If scientific, technical, or other specialized knowledge will
> assist the trier of fact to understand the evidence or to deter-
> mine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise.

Thus, the Michigan rule emphasizes the role of the court in deter-
mining preliminary issues of admissibility in general, as well as the
admissibility of scientific evidence under the *Davis-Frye* rule in
particular. See *People v Davis,* 343 Mich 348; 72 NW2d 269 (1955) and
*Frye v United States,* 54 App DC 46, 47; 293 F 1013 (1923).

From the testimony here, from Dr. Stuewer's testimony and from the other testimony, and I think from the Court's knowledge of these areas from the law it can be said that the determination of the cause of mastitis is one which should require the basic expertise possessed by a licensed practitioner, in other words, a veterinarian.

* * *

This is a rambling discussion, but I want the record to be clear on my basis for the ruling. It is the Court's view that in this circumstance, while Mr. Beale may possess great amounts of practical experience in this area, his answers here first of all satisfy me that he has not had the academic or the testing procedures that the Court feels are necessary for a person to hold himself out as an expert who can determine the cause of a medical condition in an animal.

We believe that the trial court abused its discretion in so ruling.

MRE 702 expressly provides that an expert may be qualified by virtue of his knowledge, skill, experience, training, or education. It does not refer to licensing as a method of qualification, much less as a requisite for the qualification of an expert. We do not believe that this omission was inadvertent. At best, a license is *evidence* of qualifications and thereby a useful shorthand in day-to-day commerce. Except in the most narrow legal sense,[2] a license is not a qualification in itself. Even its

[2] The licensing of veterinarians is set forth in MCL 333.18802-333.18824; MSA 14.15(18802)-14.15(18824). MCL 333.18811; MSA 14.15(18811) does proscribe the diagnosis of animal diseases without a license in veterinary medicine. However, we are apprised of no statute or rule precluding evidence as to the cause of an animal disease from those not licensed as veterinarians. In any case, we are inclined to view the requirement of licensure for diagnosis under this statute as a limitation upon diagnosis for the purpose of treatment, rather than expert testimony. Moreover, it is clear from this record that the existence of mastitis in the Mulholland herd was established by the testimony of licensed veterinarian, Dr. Stuewer, and was, in

value as evidence of qualifications is diminished in the courtroom where the expert is available and there is time for careful interrogation by both parties.

It is perhaps tempting to equate the word "expert" with the notion of a licensed professional. However, there is no basis for doing so in the text, of MRE 702. Even the generic word "expert" may be misleading, since this is not a qualification in itself, but merely the conclusion that the particular witness is qualified to give opinion testimony. As Wigmore explains:

> [I]t is *misleading to think of some witnesses as experts and others as non-experts.* In a strict sense, every witness whosoever is an expert. In other words, the very fact that he is allowed to speak at all assumes that he is fitted to acquire knowledge on the subject; though in the vast majority of matters no demonstration of his fitness is needed. It is common and not unnatural to confine the term "experts" to witnesses whose fitness, by reason of the subject-matter, needs to be first shown. But while there is (as will be seen), a practical distinction between the instances in which the fitness must be expressly shown and the instances in which it need not be, that is no reason for ignoring the fundamental principle that every witness whosoever is and must be, by hypothesis, fitted or "expert" in the matter about which he is allowed to give his supposed knowledge.
>
> In particular, it is a mistake to suppose that an "expert" must be a person professionally occupied upon the matter to be testified to. This is a mistake having its special origin in the doctrine of Opinion evidence, and can there better be considered (*post,* § 1923). It is sufficient here to note that the only requirement is that the witness must be

any event, undisputed by the defense. See n 5. See also anno: *Admissibility of opinion evidence of lay witnesses as to diseases and physical condition of animals,* 49 ALR2d 932.

fitted to acquire knowledge on the matter he speaks about; and, if he is thus fitted, that it is entirely immaterial whether he acquired his fitness by being professionally concerned in such matters. [2 Wigmore, Evidence (3d ed), § 555, pp 634-635. Emphasis in original.][3]

As Wigmore further explains, licensing generally is not required for expert medical testimony, nor should it be required:

The common law, it may be added, does not require that the expert witness on a medical subject shall be a person *duly licensed to practice medicine*; but in some jurisdictions this requirement has been introduced by statute. Except as an indirect stimulus to obtain a license, such a rule is ill-advised, first, because the line between chemistry, biology, and medicine is too indefinite to admit of a practicable separation of topics and witnesses; and, second, because some of the most capable investigators have probably not needed or cared to obtain a license to practice medicine. [2 Wigmore (Chadbourn rev), § 569, pp 789-790. Citations deleted, emphasis in original.][4]

---

[3] The same, practical concerns are dispositive under FRE 702. Thus, as one treatise explains:

Rule 702 recognizes that it is the actual qualifications of the witness that count, rather than his title, by providing that an expert can be qualified by "knowledge, skill, experience, training or education." As was pointed out in ¶ 702[02], *supra*, the court will initially have to make a relevancy determination as to whether there is an issue in the case that can be resolved by this particular expert. It will then have to decide what the appropriate qualifications are given the facts of the case. Just as the wrong title may mean that the witness is nevertheless qualified, the right title will not suffice if the witness does not have the qualifications required by the facts of the case. [3 Weinstein, Evidence, ¶ 702(04), pp 702-51 to 702-52.]

[4] Michigan has no statute prohibiting unlicensed professionals from testifying as experts. States which prohibit such testimony continue to constitute a small minority of the jurisdictions of this country. See 2 Wigmore, Evidence (Chadbourn rev), § 569, pp 789-790, ns 4-5.

Michigan has long embraced the more practical view of expert testimony. In *Evans v People,* 12 Mich 27, 37-38 (1863), it was explained:

> Circumstances may make whole communities familiar with diseases not generally known elsewhere, and reasonably competent to manage ordinary cases of such diseases, and to recognize their symptoms. Such is often the case from necessity in new countries; and the same necessity leads to a more general knowledge of the extent to which a neighborhood has suffered from any prevailing sickness than is usual in *populous towns.* And it often happens that some persons having no general skill become very familiar with particular subjects.
>
> It would be very unwise to exclude such evidence, merely because the range of the witness's knowledge is limited. There are as many grades of knowledge and ignorance in the professions as out of them. The only safe rule in any of these cases is, to ascertain the extent of the witness's qualifications, and, within their range, to permit him to speak. Cross-examination, and the testimony of others, will here, as in all other cases, furnish the best means of testing his value.

We continue to believe that the only safe rule is to ascertain with some specificity the range of the witness' qualifications and to permit testimony within that range.

As we have outlined above, Sidney Beale has a B.A. degree in agriculture with an emphasis in dairy science and has been working with milking machines and mastitis since 1950. Beale's education in this regard is informal. He explained that there was very little literature on mastitis "in the early years." Beale testified that there is a lot of literature now, although some of it is factual and some is questionable. Despite what appears to be

an inevitable lack of formal training in the area, Beale's studies and experience are extensive.

From 1950 until 1955, Beale worked at Kraft Foods. Beale was assigned to quality control work with dairy farmers. The "big problem," as Beale explained, was mastitis, and milking machines were thought to be involved in this problem. Beale consequently ran experiments with various milking machines in an attempt to reduce the incidence of mastitis in herds supplying milk to Kraft.

For the next twenty-five years, Beale worked for the Michigan Milk Producers Association. Nearly all of that time, Beale was involved in the production and marketing of milk. He supervised the laboratory and quality control program.

During ten of the last thirteen years with the MMPA, Beale also worked on the Milking Management Assistance program with a veterinarian from Michigan State University, Dr. Louis Newman. The program was designed to study the effects of milking machines on the incidence of mastitis in dairy herds. As Beale described the program, he worked with the milking machines from the layman's side, while Dr. Newman worked with cows from the professional side. Together, they gained a lot of "input" as to the role of milking machines in the creation of mastitis in dairy herds.

In addition to this employment, Beale has conducted numerous seminars on milking machinery and mastitis. Indeed, it was at one such seminar that Dr. Newman informally proposed their research project. Beale also has published at least one paper in the area and was a regular columnist in Hoarde's Dairymen. Beale is a member of the International Milk and Food Environmental Sanitarian Association and the National Mastitis Council.

Since 1978, Beale has been self-employed as a

milking-management consultant. He has worked
with farmers in fourteen states and two provinces
of Canada. Beale estimated that he consults with
about fifty farmers each year in that capacity.
Over his total career, however, Beale has inspected
milking operations on some 15,000 farms.

After carefully reviewing the record, we are
satisfied that Beale was not simply a well-qualified
expert, but perhaps *the* expert in this particular
junction of science and industry.[5] Indeed, we find it
ironic that Dr. Stuewer's testimony was cited in
support of the trial court's ruling, since it was this
licensed veterinarian who suggested that the Mul-
hollands consult Beale. Certainly at that time, Dr.
Stuewer was impressed with Beale's knowledge in
this area, and there is no indication that his
opinion had changed by the time of the trial.

Beale was frank in his admission that he was
not an expert on animal diseases in general. He
was not, however, called upon for such testimony.
Indeed, the fact that there was mastitis in the
Mulholland herd was not disputed.[6] Nor was Beale

---

[5] According to Beale's testimony, there were only two or three
milking-management consultants in the United States.

[6] That the diagnosis of mastitis in the Mulholland herd was not
seriously disputed is indicated by the following colloquy between
defense counsel and Beale:

> Q. [*Mr. Bremer*]: Have you had any classes since you've been
> out in the specific cause of mastitis and how to determine what
> has caused it in a cow?
> A. [*Mr. Beale*]: My training in that area would have been on
> a day-to-day basis with Dr. Lou Newman.
> Q. He did not teach you how to be a veterinarian?
> A. No, he did not.
> Q. He did not teach you how to be a teat end lesion specialist
> within veterinary sciences?
> A. Just how to recognize problems, is all.
> Q. Well, it doesn't take a lot of brains to see that a cow that
> squirts out lumpy stuff in her milk has got mastitis. Betty and
> Bob [Mulholland] can do that much, true?
> A. True.

called upon to diagnose mastitis, although there was ample testimony in the record that mastitis is such a common disease of dairy herds that farmers themselves not only diagnose it, but also treat it with antibiotics. Beale was simply called upon to give an opinion as to the relationship between a particular milking machine defect and the most common of dairy herd diseases.[7]

We find a striking parallel between this case and *Wolscheid v Thome,* 76 Mich 265; 43 NW 12 (1889). In *Wolscheid,* the plaintiff brought suit under a theory of breach of contract for the failure of the defendant to provide adequate care for sheep entrusted to his care. Two witnesses, Eldridge and Caruss, testified as to the adequacy of the defendant's care after examining the conditions at the defendant's farm. The Court explained:

> It was proper for them to go there and examine the lay of the land, and the character of the soil, and as experts, if they were shown to be such,—and they undoubtedly were, being farmers and extensive growers of sheep,—to give their opinion as to whether or not it was a proper place to keep sheep in the winter-time; but it was not competent for them to state as to the condition of the sheds inside, unless it was shown, as it was not, that the condition was the same when the sheep were kept there, and then to state that, as they saw it, it was not a fit place to keep sheep in. [*Wolscheid, supra,* p 271.]

*Q.* It's not hard to tell when they finally got the problem, it's which of all these various things might have caused that. That's the problem, isn't it?

*A.* It's not that big a problem.

[7] Cf. *Lewis v Bell,* 109 Mich 189; 66 NW 1091 (1896), in which this Court held that a stable hand with two years of experience was not qualified to give an opinion as to the cause of death of a team of horses under his charge.

Can it be said that Eldridge and Caruss might have given their opinion as to the adequacy of the conditions at the Thome farm, but not been allowed to give an opinion as to likely effects of inadequate conditions? We think not.[8]

Much has changed since the mid-nineteenth century. The proliferation of academic degrees and increasing specialization of labor is evident for all to see. Nevertheless, we believe that there is a world of wisdom apart from college campuses and urban high-rises. Now, as then, there is much to be gained from the practical student of the common arts. Beale exemplifies that wisdom. Beyond a doubt, his testimony would have assisted the trier of fact in deciding the cause of mastitis in the Mulholland herd.

---

[8] In *People v Hawthorne*, 293 Mich 15; 291 NW 205 (1940), Justice McALLISTER would have ruled that the testimony of an eminently qualified psychologist on the question of sanity was inadmissible on the ground that insanity is a disease and therefore falls within the study of medicine. A majority of the Court agreed with the justice's holding, affirming the defendant's conviction of manslaughter, but did so on the ground of harmless error. Justice McALLISTER's views on the psychologist's qualifications were thereby rendered obiter dictum. They nevertheless prompted an extensive and spirited discussion by the majority, who viewed the trial court's ruling otherwise as error requiring reversal. The majority, in an opinion by Justice BUTZEL, concluded:

> When a nonmedical is offered as an expert on subjects in the orbit of medical science, the trial court is put on guard and should take greater precaution in the preliminary inquiry to determine the witness's qualifications and the extent of his knowledge than might be necessary when a graduate of a medical school is proposed. Yet it may well be that for some purposes, as where the issue concerns proper medical treatment, even a licensed physician would not possess sufficient knowledge in a particular branch of his calling to satisfy a trial judge who, within discretionary limits, insists upon a high standard of reliability. There is no magic in particular titles or degrees and, in our age of intense scientific specialization, we might deny ourselves the use of the best knowledge available by a rule that would immutably fix the educational qualifications to a particular degree. [*Hawthorne, supra*, pp 24-25.]

We conclude that a review of the trial court's discretion is warranted in this instance. First, the error of the trial court is one of law, not dependent upon the complex facts of record. Second, because the expert was not qualified by the trial court, there was no cross-examination, nor was there competing expert testimony to safeguard against error. Third, quite obviously, we believe that the error was of significant magnitude, both in the context of this case and Michigan jurisprudence in general, to warrant review. Having reviewed the record and having found no basis in law or fact for the trial court's ruling, we can only conclude that it constituted an abuse of discretion.[9]

## B. THE EVIDENTIARY FOUNDATION FOR BEALE'S TESTIMONY

In addition to qualification of the witness, there must be facts in evidence to support the opinion testimony of an expert. *O'Dowd v Linehan,* 385 Mich 491, 509-510; 189 NW2d 333 (1971). The defendants alternatively argue that, even if the trial court had qualified Beale as an expert as to the cause of mastitis in the Mulholland herd, it would nevertheless have had to exclude Beale's testimony because it was based upon inadequate factual data.[10]

The Michigan Rules of Evidence provide in relevant part:

---

[9] See, generally, Friendly, *Indiscretion about discretion,* 31 Emory L J 747 (1982). That there are limits upon the exercise of the trial court's discretion in this matter has long been recognized in federal law. See Giannelli, Imwinkelried, Scientific Evidence, § 5-3, pp 154-156.

[10] A trial court's ruling which reaches the right result, although for the wrong reason, may be upheld on appeal. *Washtenaw Co Health Dep't v T & M Chevrolet, Inc,* 406 Mich 518, 520; 280 NW2d 822 (1979). *Fout v Dietz,* 401 Mich 403; 258 NW2d 53 (1977).

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. The court may require that underlying facts or data essential to an opinion or inference be in evidence. [MRE 703.][11]

Here, the defendants argue that there was an insufficient factual basis for Beale's opinion because neither Beale's own perceptions nor facts made known to him at or before the hearing would allow Beale to rule out the other potential causes of mastitis in the Mulholland herd. Implicit in the defendants' argument is the premise that ruling out the other potential causes was essential to Beale's conclusion.

It is undisputed that the immediate "cause" of mastitis is a bacterial infection of the udder. On the other hand, as Beale testified, the intermediate "cause" may be many different things with which a cow's teats come in contact. Beale explained that to know fully how any particular cow contracted mastitis, it would be necessary to eliminate a number of these potential causes. However, Beale further explained that a milking machine may mediately "cause" mastitis by damaging the teat ends, thereby making the cow more susceptible to bacterial infection upon contact. Plaintiffs' theory clearly and properly rested upon this mediate "cause" of mastitis in the Mulholland herd.[12]

---

[11] MRE 705 further provides:

The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Here, the trial court apparently required prior disclosure of the underlying facts for Beale's opinion, although that ruling is not evident in the record.

[12] See, generally, Prosser & Keeton, Torts (5th ed), § 41, pp 263-272;

Beale's own perceptions at the Mulholland farm provided an ample basis for the conclusion that a defective milking machine caused the mastitis in the plaintiffs' herd by making the cows more susceptible to infection. As we have noted, Beale observed a complete milking of the Mulholland herd on his first visit to the farm. He noticed that a number of the cows had sore teat ends and mastitis. Beale also inspected the milking machinery in particular.[13]

It is, of course *possible,* as the defendants suggested throughout the trial, that the true or more immediate cause of the mastitis was improper bedding, unsanitary stalls, or even mud in the barnyard. Neither Beale's own perceptions nor those made known to him at or before trial would allow this expert to rule out these possibilities. Nevertheless, we do not find the greater wisdom in a rule which would *require* an evidentiary basis of this sort. To the extent that they are credible, the absence of an evidentiary basis upon which an expert may rule out other potential causes may reduce the credibility of the expert.[14] To the extent

3 Restatement Contracts, 2d, § 346, comment e, p 116 (both applying the "but-for" test for causation).

[13] Beale also made a number of subsequent visits to the Mulholland farm, although it is unclear in the record the extent to which he observed the dairy operation in those visits.

[14] As explained in 2 Wigmore, Evidence (Chadbourn rev), § 659, pp 897-898:

The third corollary of the general principle of knowledge (§ 656 *supra*) is that the witness' knowledge (assuming it to be based on personal observation) must not appear to *lack adequate data as its basis of inference.* For example, when Sherlock Holmes tells his companion that the neatly dressed person who is seen passing on the street is a banker, the father of six children, and a German by birth, the ordinary intelligence wonders at a statement based on such apparently invisible data. Yet if a man passed by in working clothes daubed with lime and brickdust, the ordinary intelligence would admit that any observer had the right to assert positively that the man

that other potential causes are substantiated by the evidence of record, they may also support a verdict of comparative negligence.[15] However, to require for each expert an evidentiary basis sufficient to negate all of the possible causes which might be asserted by opposing counsel would virtually eliminate expert testimony.[16] We require only expertise of experts, not omniscience. In our view, it is sufficient if the expert has an evidentiary basis for his own conclusions. See, generally, 7 Wigmore, Evidence (Chadbourn rev), § 1922, pp 26-29.

Here, the expert provided an ample basis in his own perceptions for his testimony as to the cause of mastitis in the Mulholland herd. We do not find a lack of evidentiary basis to be an adequate alternative ground upon which to uphold the ruling of the trial court. See *Danielski v Lukomski,* 204 Mich 304; 169 NW 887 (1918). Cf. *Roberts v Young,* 369 Mich 133, 137; 119 NW2d 627 (1963).

---

was a bricklayer. Thus it is that the law may reject testimony which appears to be founded on data so scanty that the witness' alleged inferences from them may at once be pronounced absurd or extreme.

This principle, however, sound as it is in theory, can seldom have frequent application. When the source of knowledge is so insufficient, courts will rarely need to pronounce the formal exclusion of the testimony. Its weakness is self-exhibited. The risk of excluding a useful though small item of testimony is greater than the risk of admitting testimony capable of exaggeration. Cross-examination will usually furnish the exposure.

[15] Michigan follows the rule of pure comparative negligence. *Placek v Sterling Heights,* 405 Mich 638; 275 NW2d 511 (1979). The rule has been applied in product liability actions regardless of the underlying theory for recovery. See *Karl v Bryant Air Conditioning Co,* 416 Mich 558, 569; 331 NW2d 456 (1982).

[16] This is not to say that the preservation of expert testimony is an end in itself, but only that it would be irrational to exclude such evidence on the basis of the mere assumption that other asserted causes are either theoretically or statistically significant. But see n 17.

### III

#### THE DIRECTED VERDICT MOTION

The trial court granted the defendants' motion for a directed verdict, reasoning that the plaintiffs had failed to establish a causal relationship between the milking system and the increase in mastitis in their herd. It is, of course, well established in Michigan law that a prima facie case for product liability, under either a negligence or warranty theory, requires proof of a causal relationship between the defect and the damage of which the plaintiffs complain. *Piercefield v Remington Arms Co, Inc,* 375 Mich 85, 98-99; 133 NW2d 129 (1965); *Caldwell v Fox,* 394 Mich 401, 410; 231 NW2d 46 (1975); *Kupkowski v Avis Ford, Inc,* 395 Mich 155, 161; 235 NW2d 324 (1975); *Holloway v General Motors Corp (On Rehearing),* 403 Mich 614, 622; 271 NW2d 777 (1978). However, as we held in *Holloway,* p 622:

> On a motion for directed verdict, the question is whether it is reasonable to infer from the evidence, direct or circumstantial, that the accident was probably caused by a defect attributable to the manufacturer. Questions of comparative probability are to be resolved by the trier of fact.

A plaintiff in a product liability action need not offer evidence which positively excludes every other possible cause. It is enough that the plaintiff establishes a logical sequence of cause and effect, notwithstanding the existence of other plausible theories, although other plausible theories may also have evidentiary support. *Id.,* p 623. In reviewing the trial court's ruling on a defendant's motion for a directed verdict, we examine the testimony and all legitimate inferences that may

be drawn in the light most favorable to the plaintiffs. *Matras v Amoco Oil Co,* 424 Mich 675, 681; 385 NW2d 586 (1986).

Here, the testimony of Sidney Beale would have established a logical sequence of cause and effect between the alleged defect in the DEC system and the increase of mastitis in the Mulholland herd.[17] We are aware of the defendants' theories that the increase of mastitis was caused by the rapid introduction of new cows into the herd, the use of lime bedding, unsanitary stalls, and mud in the barnyard. Indeed, the plaintiffs' proofs themselves provide some evidentiary basis for these theories. However, viewing the evidence, particularly the voir dire testimony of Beale, most favorably toward the plaintiffs, we can only conclude that a sufficient causal relationship between the DEC system and the increase of mastitis would have been proven.[18] We therefore conclude that the trial

---

[17] The defendants have, at times, argued that no actual damages were incurred, asserting that the milk production of the Mulholland herd actually increased after the introduction of the DEC system. However, the support in the record for this conclusion remains unclear and this conclusion is contradicted by the direct testimony of Robert Mulholland. Moreover, the defendants apparently did not specifically state this issue as a basis for their motion, but instead relied upon the theory that no causal relationship was proven between the increase in mastitis and the DEC system. We therefore decline to consider this issue on appeal. See MCR 2.515; 3 Martin, Dean & Webster, Michigan Court Rules Practice, Rule 2.515, comment 3, p 226.

[18] This matter might be resolved differently if Beale had conceded, for example, that an improperly configured milking machine was one of ten possible, immediate causes of the mastitis, all with an equal probability of being the sole cause:

On the issue of the fact of causation, as on other issues essential to the cause of action for negligence, the plaintiff, in general, has the burden of proof. The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at

court further erred in directing a verdict for the defendants.[19]

## IV

### CONCLUSION

The judgments of the circuit court and the Court of Appeals are reversed, and the case is remanded to the circuit court for further proceedings. We do not retain jurisdiction.

LEVIN, CAVANAGH, and ARCHER, JJ., concurred with BOYLE, J.

GRIFFIN, J. (*dissenting*). The majority concludes that the trial court erred in ruling that witness Sidney Beale was not qualified to give an expert opinion as to the cause of mastitis in plaintiffs' cows. I respectfully dissent.

The decision to qualify a witness as an expert is a matter for the discretion of the trial court, and its decision is not to be reversed absent abuse of discretion. *Siirila v Barrios,* 398 Mich 576, 591; 248 NW2d 171 (1976); *McEwen v Bigelow,* 40 Mich 215, 217 (1879).

In this case, Beale, a milking-management consultant, was called by plaintiffs as a witness and asked questions concerning his extensive experi-

---

best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. [Prosser & Keeton, *supra,* § 41, p 269.]

Beale made no such concession despite the suggestions of defense counsel.

[19] Our resolution of this issue obviates the need to consider the defendants' argument that causation may only be proven by direct, rather than circumstantial, evidence. We do note that the defendants' assertion has generated essentially no support in this Court in the past. See, e.g., *Holloway v General Motors Corp,* 399 Mich 617; 250 NW2d 736 (1977), rev'd on reh 403 Mich 614; 271 NW2d 777 (1978).

ence with milking machines. Beale's expertise relating to the design and functioning of milking machines was well documented and is not disputed. However, upon voir dire Beale conceded that he was not an expert on the medical causes of mastitis.[1] Further, he admitted that he had received very limited formal education relating to mastitis, and that he had little practical experience or specialized training per se in connection with that disease.[2] He also admitted that he was not an expert on cows' teat-end lesions.[3]

There was no challenge to the claim by Beale that he was an expert in the design of milking machine systems. However, after reviewing the

[1] Beale testified as follows:

*Q.* Isn't it true that you are not an expert in the medical causes of mastitis? You've admitted that under oath before?

*A.* I don't follow what you mean by medical causes of mastitis.

*Q.* You were asked under oath, "Are you an expert in the medical causation of mastitis?" I believe that's a quote, and you admitted you weren't, isn't that true?

*A.* That would be true because there isn't any medical causes I know of.

[2] Upon direct examination, Beale testified:

*Q.* When did you have any formal training on mastitis?

*A.* I had just the basic that you get in college, Dairy Bacteriology, and I've had opportunity to work on some problems, but that wouldn't be the formal education.

*Q.* Did you have any practical experience or specialized training in mastitis?

*A.* Not per se. I took one—as I recall I took a problems course when I was in college, which would be more or less just an overview of a problem.

[3] Upon voir dire by counsel for DEC, Beale testified:

*Q.* Well, you're not only not a veterinarian, but you're not a teat end lesion expert, either?

*A.* I'm not an expert in that area, but I can recognize when a teat end is not normal and healthy.

limits of Beale's education and experience and focusing upon the fact he was not a licensed veterinarian, the judge ruled that Beale "has not had the academic or the testing procedures that the Court feels are necessary for a person to hold himself out as an expert who can determine the cause of a medical condition in an animal."

Particularly in light of Beale's admissions, I cannot agree with the majority that the trial court abused its discretion. On these facts, we are not required to reach the question whether one must be a veterinarian to give expert testimony concerning the diagnoses and causes of animal diseases. However, under these circumstances, certainly it was not inappropriate for the trial judge to consider that Beale lacked the credentials of a licensed veterinarian. As the judge explained, the state has established minimum standards of qualification to practice certain of the professions. Surely, a judge is not to be faulted for taking those standards into account.

A dental assistant with twenty years of experience in a dentist's office might well absorb an extraordinary practical education in the field of dentistry. It is possible that one judge would find the assistant competent to testify as an expert in that field. However, it is also possible that a different judge could reach the contrary conclusion, and in so doing he might ascribe weight to the facts that the assistant lacked the formal education of a dentist and was not licensed to practice that profession. I would be hard pressed to say that either judge abused his discretion.

In the past we have frequently cautioned appellate courts against a substitution of judgment as to matters that clearly fall within the discretion of the trial court. For example, in the early case of

*Scripps v Reilly,* 35 Mich 372, 387 (1877), this Court stated:

> It can never be intended that a trial judge has purposely gone astray in dealing with matters within the category of discretionary proceedings, and *unless it turns out that he has not merely misstepped, but has departed widely and injuriously, an appellate court will not re-examine. It will not do it when there is no better reason than its own opinion that the course actually taken was not as wise or sensible or orderly as another would have been.* [Emphasis supplied.]

In *Detroit Tug & Wrecking Co v Gartner,* 75 Mich 360, 361; 42 NW 968 (1889), the Court said:

> To warrant this Court in interfering in matters so entirely in the sound discretion of the circuit court as the granting or refusing of a new trial, the abuse of discretion ought to be so plain that, upon consideration of the facts upon which the court acted, *an unprejudiced person can say that there was no justification or excuse for the ruling made.* [Emphasis supplied. See also *Brookdale Cemetery Ass'n v Lewis,* 342 Mich 14; 69 NW2d 176 (1955), and *Spalding v Spalding,* 355 Mich 382; 94 NW2d 810 (1959).]

Our insistence upon deference to the trial judge in such matters is not inconsistent with the rule in other jurisdictions. For example, the United States Supreme Court has recognized that a reviewing court may not find abuse of discretion in a trial court's ruling on the qualifications of an expert just because it would have ruled differently had it sat as the trial court. In *Chateaugay Ore & Iron Co v Blake,* 144 US 476, 484; 12 S Ct 731; 36 L Ed 510 (1892), the Court stated:

> How much knowledge a witness must possess

before a party is entitled to his opinion as an
expert is a matter which, in the nature of things,
must be left largely to the discretion of the trial
court, and its ruling thereon will not be disturbed
unless clearly erroneous.

After reviewing the qualifications of the witness,
the Supreme Court affirmed and commented: "We
think the ruling of the trial court in excluding his
opinion was right; at any rate, it cannot be ad-
judged clearly erroneous." *Id.* See also *Turner v
American Security & Trust Co,* 213 US 257, 261; 29
S Ct 420; 53 L Ed 788 (1909); *Wojciuk v U S
Rubber Co,* 19 Wis 2d 224, 230; 120 NW2d 47
(1963) (" 'The questions in that regard, however,
relate to mere competency, and, therefore, *the
trial judge's determination thereof, within all rea-
sonable limits is supreme'* " [emphasis supplied]);
*Henningsen v Bloomfield Motors, Inc,* 32 NJ 358,
411; 161 A2d 69 (1960) ("In our view, the experi-
ence of the witness, as an automobile repairman
and as an appraiser of damaged cars, was such as
to preclude a holding by us that the trial court
accepted his qualifications *without any reasonable
basis"* [emphasis supplied]); *Ricard v Prudential
Ins Co of America,* 87 NH 31, 33; 173 A 375 (1934)
("The only question before us is *whether there is
any evidence upon which the decision of that court
could reasonably be made"* [emphasis supplied]);
and *Webb v Olin Mathieson Chemical Corp,* 9
Utah 2d 275; 342 P2d 1094 (1959).

Such cases are illustrative of the general rule as
set forth by a leading author on evidence:

As with the question of whether expert opinion
upon the subject matter should be permitted, the
qualification of the expert is a question which lies
within the sound discretion of the trial judge
whose ruling will not be overturned in the absence

of clear abuse, a standard which will rarely be met. [3 Weinstein, Evidence, Opinions and Expert Testimony, § 702(04), pp 702-45 to 702-47. See also 5 Am Jur 2d, Appeal and Error, § 843, p 287; 31 Am Jur 2d, Expert and Opinion Evidence, § 31, pp 530-533.]

In this instance the trial judge's ruling was sound, particularly in light of undisputed record evidence that the mastitis in plaintiffs' herd may have been related to one or more of a number of causes.[4] Plaintiff Robert Mulholland admitted that cows in the herd had mastitis problems before the

---

[4] Plaintiff Robert Mulholland testified upon direct examination:

    *Q.* Did you have any—is mastitis a common ailment or common problem in cow herds?
    *A.* Oh, farmer's always got a few. He shouldn't have very many, but he's always going to have a few.
    *Q.* And do you know some of the causes of the mastitis?
    *A.* Yes, there's injury is the biggest cause, but it can be a lot of things will cause it, but injury's your biggest problem.

George Stuewer, the veterinarian, testified upon direct examination:

    *Q.* Have you made a study or have you familiarized yourself with mastitis?
    *A.* Over the years, certainly.
    *Q.* And can you tell different—what causes it?
    *A.* Many things.

Finally, Beale testified upon voir dire examination by counsel for DEC:

    *Q.* Mr. Beale, there has been testimony from a veterinarian that has already testified in this case that mastitis may be caused by many different things that a cow's teats may come into contact with. You would at least accept that, wouldn't you?
    *A.* Yes.
    *Q.* You can get from [sic] the environment, by dragging its teats through the mud?
    *A.* Yes.
    *Q.* It can get it if it happens to be lying in its own manure?
    *A.* Yes.
    *Q.* Will cows do that if the manure isn't taken out regularly?
    *A.* Yes.

DEC milking system was installed,[5] and his records showed that as late as seven months after the system was modified by Beale, eighteen cows were being treated for mastitis, eleven of which had not been treated before. Dr. George Stuewer, a veterinarian, testified that nationwide, forty percent of all cows have two or more quarters which are infected with mastitis.

Plaintiff Robert Mulholland acknowledged that unsanitary conditions or unsuitable bedding may be a contributing cause of mastitis, and there was evidence at trial that these conditions existed on plaintiffs' farm. Mr. Robert Mulholland testified that in 1979 and 1980 the Department of Agriculture inspected the farm and instructed him to clean the barn walls and to change the inflations (rubber lining) of the claws of their milking machines. Despite those instructions, he admitted that after four and one-half years he had not completely cleaned out the cows' stalls.

Mr. Robert Mulholland also testified that he put lime bedding in the stalls in September, 1980.[6]

> *Q.* It can get bacteria into its teats from the bedding if the bedding turns out to be unsuitable material?
> *A.* This is—these are all true, providing the . . .

[5] Robert Mulholland testified upon cross-examination by counsel for Crawford:

> *Q.* Now, I understand your testimony to be that immediately before you moved into the new system in [sic] March 19th, 1980, you had no cases of mastitis, true?
> *A.* We didn't have any the day we move [sic] in, right.
> *Q.* Well, what about a couple days before?
> *A.* I couldn't tell you about a couple days. There was [sic] times we had one or two cases of mastitis all the way, all our life, but I couldn't tell you the exact dates by now.

[6] According to Robert Mulholland, an "epidemic of mastitis" struck in October or November, 1980. This was one to two months after lime was placed in the cows' stalls.

Thereafter, on December 17, 1980, Dr. Mellenberger of the Michigan State University Extension Service advised the Mulhollands to remove the lime, an irritating substance, from the cows' bedding. Notwithstanding that advice, the lime was not removed. According to Mr. Robert Mulholland, "We didn't clean it out. We just kept adding sawdust to it."

In addition, the record suggests the possibility that cows purchased by plaintiffs to expand their herd were already infected. Robert and Richard Mulholland testified that they bought at least eighty-nine cows between November, 1979, and March, 1981, and that none of that number was tested for mastitis.

Dr. Stuewer, a licensed veterinarian, testified that sometimes it is impossible to detect the precise cause of mastitis,[7] and that he was "not going to attempt as an expert witness to tell anybody that the milking equipment was definitely involved" in the cows' mastitis problem. In response to a question, Beale conceded that it would be necessary to eliminate all the other potential causes before it would be possible to settle on one cause of mastitis in a particular cow.[8]

---

[7] Dr. Stuewer testified upon cross-examination by counsel for Crawford:

> *Q.* And am I also correct that by knowing what type of bacteria is causing the mastitis sometimes that gives you a clue as to how the mastitis was caused, isn't that true?
> *A.* Well, it will give you the—give you a clue as to what organism is involved. It might—there might be some other factor that triggers the mastitis, of course, that you don't find out, and sometimes there's probably nothing that you can put your finger on that did trigger it.

[8] Beale's concession came during voir dire by counsel for defendant DEC:

> *Q.* If we're going to try to determine what the—of all these

If the "abuse of discretion" standard is to have meaning, there must be room for some difference in judgment. *Williams v Hofley Mfg Co,* 430 Mich 603, 619; 424 NW2d 278 (1988). In this case, the question presented admittedly is a close call. Precisely because that is so, the trial judge's decision is entitled to deference. We cannot say there was abuse of discretion because we might have ruled differently had we been sitting as the trial court.

I would affirm the decision of the Court of Appeals.

RILEY, C.J., and BRICKLEY, J., concurred with GRIFFIN, J.

---

potential causes, is the cause of mastitis in one particular cow, then we're really going to have to find a way that we can eliminate all the other potential causes and settle on the one cause that we say did cause the mastitis to occur in that's [sic] cow's teat, correct?

*A.* Yes.