Erol PAISLEY, Plaintiff,

v.

**WATERFORD ROOF TRUSS, LTD., and Ronald Nmi Hollingsworth, Defendants.**

**Civil Action No. 96–40223.**

United States District Court, E.D. Michigan, Southern Division.

July 11, 1997.

Danielle S. Yatooma, Southfield, MI, for Plaintiff.

Mary Catherine Rentz, Detroit, MI, for Defendant.

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

GADOLA, District Judge.

This negligence action was filed on June 2, 1996 by plaintiff Erol Paisley against defendants Waterford Roof Truss, Ltd. and Ronald NMI Hollingsworth. Plaintiff seeks non-

economic damages under the Michigan No-Fault Insurance Act, Mich. Comp. Laws § 500.3135, for injuries which allegedly arose out of a motor vehicle accident. Presently before this court is defendants' motion for summary judgment filed on March 21, 1997. For the following reasons, defendants' motion will be granted.

## FACTS

This litigation stems from an incident which occurred on or about December 29, 1993, at approximately 4:00 p.m. while plaintiff Erol Paisley was operating a taxi cab eastbound on I–94 at or near the intersection of Mt. Elliot in the City of Detroit, Michigan. Plaintiff maintains that on that date and at that time he was driving alongside a tractor-trailer rig driven by defendant Ronald NMI Hollingsworth, an employee-driver for defendant Waterford Roof Truss, Ltd. A piece of metal was allegedly protruding from the underside of defendants' vehicle and tearing apart pieces of cement from the road. One such piece of cement, so plaintiff alleges, landed atop defendants' tractor-trailer, fell off defendants' vehicle, and ultimately plummeted through the windshield of plaintiff's vehicle.[1] Plaintiff alleges that the piece of cement struck him in the left jaw and neck area, causing him severe injuries.

On the night of the incident, plaintiff was taken to the Port Huron Hospital emergency room via ambulance. An x-ray examination of the cervical spine, facial bones, mandible and chest were negative. Plaintiff was diagnosed as having an "acute left facial contusion" and a "2 cm laceration." (Port Huron Hospital Emergency Center Record of 12/30/93, at 1). The laceration was repaired with three sutures.

On January 10, 1994, plaintiff visited Dr. Steven Dorfman, a chiropractor, complaining of "severe pain and stiffness throughout his neck and midback regions, as well as jaw and facial pain and left shoulder discomfort." (Letter from Dr. Dorfman to Bohnenstiehl of 5/2/94, at 1). A structural examination of plaintiff revealed to Dr. Dorfman the following: (1) reduction in the normal range of motion in cervical flexion, extension, as well as left and right rotation and left and right lateral flexion; (2) reduction in the range of motion of the dorsal spine in flexion, extension, as well as left and right rotation; and (3) objective muscle spasms throughout the entire dorsal and cervical spines. An x-ray was taken, showing that plaintiff sustained no fractures or dislocations. The x-ray revealed, however, that plaintiff "demonstrated an inability to flex and extend the cervical spine in the proper manner," as well as "a moderate degree of degenerative changes [ ] throughout the cervical spine." (Letter from Dr. Dorfman to Bohnenstiehl of 5/2/94, at 2). Dr. Dorfman's diagnosis was "severe and chronic interligamentous cervical-dorsal sprain" and "possible temporomandibular joint dysfunction" ("TMJ dysfunction-" or "jaw dysfunction"). (Letter from Dr. Dorfman to Bohnenstiehl of 5/2/94, at 3). Plaintiff's prognosis was "guarded." (Letter from Dr. Dorfman to Bohnenstiehl of 5/2/94, at 3). He was advised to abstain from any physical activities which included excessive lifting, pushing, pulling or reaching. Overall, Dr. Dorfman administered 26 chiropractic treatments (e.g., hot packs and manipulation) from January through May, 1994.[2]

On January 11, 1994, plaintiff was seen by Dr. Sheldon Rocklin, DDS, FICCMO for "pain when eating, neckaches and daily headaches." (Letter from Dr. Rocklin to Bohnenstiehl of 9/29/94, at 1). Dr. Rocklin's diagno-

---

1. The cement allegedly landed and fell from about mid-section of the tractor-trailer.

2. Plaintiff was involved in a rear-end impact accident on December 4, 1991. He visited Dr. Dorfman on December 5, 1991 complaining of stiffness throughout his neck, middle and low back regions, as well as severe headaches, tinnitus and jaw pain. Like the January 10, 1994 visit, Dr. Dorfman found during the December 5, 1991 visit that plaintiff had an overall reduction to the normal range of motion in flexion and

extension, as well as left and right rotation and left and right flexion. Similar to the January 10, 1995 visit, Dr. Dorfman found during the December 5, 1991 examination that plaintiff "demonstrated an inability to flex the cervical spine in the proper manner." And, on January 10, 1994, he diagnosed plaintiff with "severe and chronic interligamentous cervical sprain" and considered his prognosis to be "guarded" just as he did on December 5, 1991.

sis was arthromyalgia, asymmetrical motor neuropathy, atypical facial pain, cephalgia (a.k.a. headaches), crepitus of the temporamandibular joint, myalgia, myofascial pain dysfunction, myoneural disorder,[3] myositis,[4] otalgia (a.k.a. earache), tinnitus (a.k.a. ringing in the ears) and traumatic arthropathy.[5] His prognosis was that "changes in the sensory motor mechanism have been altered on a long-term basis creating an [sic] habitual dysfunctional pattern." (Letter from Dr. Rocklin to Bohnenstiehl of 9/29/94, at 3). He also noted that "the internal arrangement of the temporamandibular joint has been permanently altered with the dislocation of the disk, accompanied by the stretching and/or tearing of the attached ligaments." (Letter from Dr. Rocklin to Bohnenstiehl of 9/29/94, at 3). Dr. Rocklin treated plaintiff on ten occasions from January, 1994 through May, 1995.

On January 14, 1994, plaintiff visited Henry Ford Hospital's Emergency Room complaining chiefly of pain in his left shoulder area and pain in the left side of his jaw. (Report of Dr. Ashok Gupta of 1/14/94, at 2). X-rays of the skull, facial bones and mandible were negative. Examination of plaintiff by Dr. Ashok Gupta showed that he was "able to open and close his mouth adequately" and that "side to side jaw movement" was "normal." (Report of Dr. Ashok Gupta of 1/14/94, at 2). Plaintiff also was found by Dr. Gupta to have "complete range of movements" in his "right and left shoulder." (Report of Dr. Ashok Gupta of 1/14/94, at 2). He was given a prescription for Motrin and instructed to apply a heating pad. He was also told to avoid all heavy lifting with his left arm.

On March 1, 1994, plaintiff saw Dr. Christian at the Oral and Maxillofacial Surgery Department at Henry Ford Hospital. He complained of pain in his left jaw, especially when chewing. Plaintiff denied that there was any "popping or clicking" of his jaw. (Report of Dr. Christian of 3/1/94). He was clinically examined and found to "have no fractures of the facial bones or upper extremities" and "unrestricted movement of the neck." (Report of Dr. Christian of 3/1/94). A radiographic examination showed "some mild flattening of the left TMJ." (Report of Dr. Christian of 3/1/94). Plaintiff was instructed to rest the jaw by using a liquid to extremely soft diet for 2–4 weeks.

On February 20, 1995, plaintiff visited Henry Ford Hospital for shoulder pain. A physical examination revealed that plaintiff had "full range of motion on the left shoulder, with 180 degrees of flexion, 180 degrees movement on abduction, and full 90 degrees internal and external rotation." (Henry Ford Hospital Report of 2/22/95, at 1). He was "able to touch approximately T5 with his thumb behind his back on both right and left arms." (Henry Ford Hospital Report of 2/22/95, at 1). An ultrasound and MRI were recommended. He was given Motrin for his pain and told to follow-up with the clinic after the tests.

Plaintiff underwent an ultrasound of the left shoulder and MRI of his neck, then returned to Henry Ford Hospital on May 1, 1995. He complained of pain in his left shoulder area during this visit. An examination revealed that plaintiff had "good range of motion, forward flexion and abduction 180 degrees, external rotation 60 degrees bilaterally, internal rotation to approximately T10 bilaterally." (Henry Ford Hospital Report of 5/4/95, at 1). Yet, the ultrasound left impressions of muscle tears[6] and "rotator cuff tendinitis." (Henry Ford Hospital Report of 5/4/95, at 1). Plaintiff was given a prescription for physical therapy. Operative intervention was not considered necessary at that time.

---

3. "Myoneural" means "pertaining to both muscle and nerve: said of the nerve termination in muscles." *Dorland's Illustrated Medical Dictionary* 888 (23rd ed.1957).

4. "Myositis" is "inflammation of a voluntary muscle." *Dorland's Illustrated Medical Dictionary* 889 (23rd ed.1957).

5. "Arthropathy" is defined as "any joint disease." *Dorland's Illustrated Medical Dictionary* 133 (23rd ed.1957).

6. Specifically, tears of the supraspinatus and subscapularis, as well as subacromial bursitis were noticed.

On July 10, 1995, plaintiff was re-checked at Henry Ford Hospital. At that time, he complained of a new pain in his right shoulder. However, he stated that physical therapy was helping "slightly" with the pain in his left shoulder. (Henry Ford Hospital Report of 7/12/95, at 1). He was examined and found to have "good range of motion on his cervical spine." (Henry Ford Hospital Report of 7/12/95, at 1). He could "forward flex both arms to 180 degrees" and "abduct to 180 degrees bilaterally." (Henry Ford Hospital Report of 7/12/95, at 1). "External rotation [was] 75 degrees bilaterally, internal rotation to T5 on the right and T7 on the left." (Henry Ford Hospital Report of 7/12/95, at 1). He was instructed to continue with physical therapy for eight weeks.

At his deposition on February 6, 1997, plaintiff was questioned about the problems which plague him today and which he attributes to the accident. He stated that he currently suffers from ringing in his ears and pain in his shoulder. He testified that he could no longer afford to play cricket and that at times, he must use his right hand and not his left.

On March 21, 1997, defendants filed a motion for summary judgment, raising two separate and independent grounds for dismissing this action. Defendants assert that plaintiff's claim for non-economic loss is precluded by Michigan's No–Fault Insurance Act. In the alternative, defendants insist that plaintiff cannot meet his burden of proving causation, an essential element of his case. Each argument will be addressed *seriatim.*

## DISCUSSION

### 1. Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984) (citation omitted). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210—11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir.1986) This burden "may be discharged by 'showing'— that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. Fed.R.Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

To create a genuine issue of material fact, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986),

> There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

(Citations omitted). *See Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The evidence itself need not be the sort admissible at trial. *Ashbrook v. Block,* 917 F.2d 918, 921 (6th Cir.1990). However, the evidence must be more than

the nonmovant's own pleadings and affidavits. *Id.*

### 2. Plaintiff Has Raised a Genuine Issue of Material Fact as to Whether He Has Suffered a "Serious Impairment of a Body Function"

Defendants argue that all plaintiff's damages are precluded by the Michigan No–Fault Insurance Act ("the Act"), Mich. Comp. Laws § 500.3135(1). In particular, defendants contend that plaintiff cannot meet the threshold for recovering non-economic damages under the Act since his injuries do not constitute a "serious impairment of body function." This court disagrees.

### a. The Michigan No–Fault Act's "Serious Impairment of Body Function" Requirement

■ The Michigan No–Fault Insurance Act, Mich. Comp. Laws § 500.3135(1) provides, in pertinent part, as follows:

A person remains subject to tort liability for noneconomic loss caused by his or her ownership, maintenance, or use of a motor vehicle *only* if the injured person has suffered death, *serious impairment of body function,* or permanent serious disfigurement.

(emphasis added).[7]

■ In assessing whether a person suffered a serious impairment of body function the focus is not on the effect an injury has on a particular person's life. *DiFranco v. Pickard,* 427 Mich. 32, 62–67, 398 N.W.2d 896 (1986).[8] Rather, the test is objective, and consists of two inquiries. *Id.* at 67, 398

N.W.2d 896.[9] The first of the two inquiries is: "[w]hat body function, if any, was impaired because of injuries sustained in [the] motor vehicle accident." *Id.* The second inquiry is: whether the impairment was "serious." *Id.* In regard to the latter question, a court should take into account "the extent of the impairment [often expressed in numerical terms (e.g. 10% limitation in back movement) ], the particular body function impaired, the length of time the impairment lasted,[10] the treatment required to correct the impairment, and any other relevant factors." *DiFranco,* 427 Mich. at 69–70, 398 N.W.2d 896. "A comparison of plaintiff's abilities and activities before and after the accident may be relevant insofar as it establishes the existence, extent and duration of an impairment of body function." *Id.* at 68, 398 N.W.2d 896.

■ If there is no material factual dispute as to the nature and extent of the plaintiff's injuries, but the facts can support conflicting inferences in the minds of reasonable jurors as to whether the plaintiff suffered a "serious impairment of body function," then summary judgment should not be granted to either the plaintiff or the defendant. *Id.* at 58, 398 N.W.2d 896. Conversely, summary judgment should be granted to the defendant if "it can be said with certainty that no reasonable jury could view plaintiff's impairment as serious." *Id.* at 51, 398 N.W.2d 896 (*citing Brooks v. Reed,* 93 Mich.App. 166, 171, 286 N.W.2d 81 (1979), *lv. app. denied,* 411 Mich. 862 (1981)). In other words, summary judgment should be granted to the defendant if

---

7. The purpose of Michigan No–Fault Act is to partially abolish tort remedies for injuries arising from motor vehicle accidents and substitute entitlement to first-party benefits for those traditional tort remedies. *Stephens v. Dixon,* 449 Mich. 531, 541, 536 N.W.2d 755 (1995) (*quoting Shavers v. Attorney General,* 402 Mich. 554, 578–79, 267 N.W.2d 72 (1978)).

8. On March 28, 1996, the Michigan Legislature passed an amendment to the Act, defining "serious impairment of body function" as an "objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life." *See* Mich. Comp Laws § 500.3135(7). This amendment overrules *DiFranco* and would present a much

more formidable hurdle for plaintiff. Yet, this amendment is not applicable in the instant case because it was filed on April 2, 1996. The amendment only applies to cases filed 120 days after March 28, 1996.

9. The focus of both these inquiries "is not on the injuries themselves, but [rather on] how the injuries affected a particular body function." *DiFranco,* 427 Mich. at 67, 398 N.W.2d 896.

10. "Generally, medical testimony will be needed to establish the existence, extent and permanency of the impairment." *DiFranco,* 427 Mich. at 67, 398 N.W.2d 896. Yet, "[a]n impairment need not be permanent to be serious." *Id.* at 70, 398 N.W.2d 896.

the injuries were "so minor" or of a "clearly superficial nature." *Id.* at 51–51, 398 N.W.2d 896 *(citing Vitale v. Danylak,* 74 Mich.App. 615, 620, 254 N.W.2d 593 (1977)).[11]

### b. Plaintiff Has Raised a Genuine Issue of Material Fact as to Whether He Has Suffered a "Serious Impairment of a Body Function"

■ In the instant case, although a close question, it cannot be said with certainty that a reasonable juror would find plaintiff's injuries to his back and jaw to be so minor or of such a superficial nature that they do not constitute a "serious impairment of body function." Rather, a rational fact-finder could conclude that plaintiff's injuries affected "the ability of his body, in whole or part, to function." Accordingly, summary judgment cannot be granted to the defendant with respect to this issue. *DiFranco,* 427 Mich. at 60, 398 N.W.2d 896.

Plaintiff's complaints of pain in the shoulder and jaw were objectively manifested through his sub-optimal performance on range of motion tests. *DiFranco,* 427 Mich. at 74, 398 N.W.2d 896 (holding that plaintiffs must introduce evidence establishing a physical basis for their subjective complaints of pain and suffering and rejecting the requirement in *Williams v. Payne,* 131 Mich.App. 403, 409, 346 N.W.2d 564 (1984), that an injury be demonstrated through use of "accepted" medical tests and procedures). Dr. Dorfman noticed that plaintiff did not have normal range of motion in cervical flexion, extension, as well as left and right rotation and left and right lateral flexion. He also found plaintiff suffered a reduction in the range of motion of the dorsal spine in flexion, extension, as well as left and right rotation. Dr. Dorfman opined that "multiple exacer-

bations of his symptoms in the future [were] probable" and characterized plaintiff's prognosis as "guarded." Similarly, Dr. Rocklin considered plaintiff's injury to the TMJ to be "severe" and his prognosis "guarded." He determined that changes in the motor mechanism of plaintiff were altered on a long-term basis creating a habitual dysfunctional pattern. Furthermore, the fact that plaintiff underwent treatment for his soft tissue injuries (e.g. muscle tears and spasms) from the date of the accident through July, 1995, including 26 chiropractic sessions, 10 treatments at the TMJ Center of Southfield and numerous weeks of physical therapy, also weighs in favor of finding a serious impairment.

The case *sub judice* is similar in many respects to *Beard v. Detroit,* 158 Mich.App. 441, 404 N.W.2d 770, *lv. app. denied,* 428 Mich. 901, 408 N.W.2d 783 (1987), and in *Beard,* the court found that reasonable minds could differ as to whether plaintiff's overall impairment due to his physical injuries[12] was "serious." In particular, the following facts in *Beard* are analogous to the facts of the instant case: (1) on the night of the accident, plaintiff's x-rays revealed no fracture or abnormality in the skull and spine, (2) plaintiff was diagnosed with a cervical sprain; (3) plaintiff went to a specialist, specifically a neurologist, soon after the accident complaining that "just about everything hurt" and was prescribed physical therapy;[13] (4) plaintiff visited a chiropractor who noted muscle spasms and extreme sensitivity in the cervical spine; (5) a few years after the accident, in 1983, plaintiff saw a physician for pain management, who believed that plaintiff would not need any restrictions in terms of physical activities; and (6) in July 1983,

11. On March 28, 1996, the Michigan Legislature passed an amendment overruling *DiFranco,* 427 Mich. 32, 398 N.W.2d 896, in another respect, Under the amendment, Mich. Comp. Laws § 500.3135(2)(a)(I), the issue of whether an injured person has suffered a serious impairment of body function is a question of law for the court to decide if "[t]here is no factual dispute concerning the nature and extent of the person's injuries." This amendment only applies to cases filed 120 days after March 28, 1996. Since the instant case was filed on April 2, 1996, the

amendment has no force here. *See supra* note 8, at 1194. If the amendment was applicable, plaintiff would face an increasingly onerous burden.

12. The plaintiff in that case also allegedly suffered emotional injuries which he claimed constituted a serious impairment to body function.

13. The doctor prescribed physical therapy three time a week for about six months.

plaintiff sought treatment[14] for a temporamandibular joint dysfunction.[15] Since the court in *Beard* submitted the question of whether plaintiff suffered a serious impairment to body function based on his physical injuries to the jury, so must this court.

### 3. Plaintiff Has Not Raised a Genuine Issue of Material Fact as to Causation

Defendants also move for summary judgment on the ground that plaintiff cannot establish an essential element of his negligence claim, to wit: causation. According to defendants, plaintiff is merely speculating and has no probative evidence that defendants' vehicle was the cause in fact of plaintiff's alleged injuries. This court agrees.

### a. The Cause In Fact Element of a Negligence Claim

■ It is axiomatic that liability for negligence does not attach unless the plaintiff establishes that the injury in question was caused by the defendant's negligence. *Brisboy v. Fibreboard Corp.*, 429 Mich. 540, 547, 418 N.W.2d 650 (1988); *Schutte v. Celotex*

*Corp.*, 196 Mich.App. 135, 138, 492 N.W.2d 773 (1992), *lv. app. denied*, 442 Mich. 912, 503 N.W.2d 448 (1993). Proving causation "actually entails proof of two separate elements: (1) cause in fact, and (2) legal cause, also known as 'proximate cause.'" *Skinner v. Square D. Co.*, 445 Mich. 153, 163, 516 N.W.2d 475 (1994) (*citing Moning v. Alfono*, 400 Mich. 425, 437, 254 N.W.2d 759 (1977)). A plaintiff must adequately establish cause in fact first. Legal cause or proximate cause becomes a relevant issue only *after* plaintiff establishes cause in fact. *Id.*

■ The cause in fact element requires plaintiff to "present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred." *Skinner*, 445 Mich. at 165, 516 N.W.2d 475. Plaintiff's cause in fact theory must have "some basis in established fact" and be more than mere "conjecture." *Id.* See also *Mulholland v. D.E.C. Intern. Corp.*, 432 Mich. 395, 415–16, n. 18, 443 N.W.2d 340 (1989) (holding that a *prima facie* case of negligence requires proof of a causal rela-

---

**14.** Plaintiff wore an intraoral appliance and the temporamandibular joint dysfunction resolved itself by December, 1984.

**15.** As stated above, plaintiff has just barely introduced enough evidence to survive a summary judgment motion. There is significant evidence supporting defendants' position that plaintiff did not suffer a serious impairment to body function. First, plaintiff's injuries are all of the nature of muscle sprains and tears for which plaintiff has sought sporadic treatment over a one-and-a-half year period. *See e.g. Johnston v. Thorsby*, 163 Mich.App. 161, 413 N.W.2d 696 (1987) (holding that plaintiff did not suffer a "serious impairment to body function" where she was diagnosed as lumbosacral strain shortly after the accident, waited two years before seeing any other doctors at which time she was diagnosed with a torn rotator cuff that has since healed). *See also Licari v. Elliott*, 57 N.Y.2d 230, 455 N.Y.S.2d 570, 441 N.E.2d 1088 (1982) (holding that plaintiff did not sustain a "significant Limitation of use of a body function or system" where plaintiff sustained a concussion, acute cervical sprain, acute dorsal lumbar sprain, and chest contusion; plaintiff offered no evidence as to the extent of limitation of movement and at most established that he had suffered a painful sprain which limited his back and neck motion somewhat) (cited with approval in *DiFranco*, 427 Mich. at 69 n. 51, 398 N.W.2d 896.). Second, there are numerous medical reports which indicate the extent of the impairment is minimal, if at all. Certain

documents reveal that plaintiff has full range of motion in his jaw, shoulder, and neck. For instance, Dr. Gupta's January 14, 1994 report indicated that plaintiff was able to open and close his mouth adequately. Dr. Christian's March L, 1994 report shows that plaintiff had "unrestricted movement of the neck." The Henry Ford Hospital reports dated February 22, May 4 and July 12, 1995 reveal that plaintiff had good range of motion, flexion, abduction, and rotation. Third, plaintiff has never undergone any surgery for his injuries, which tends to mitigate the severity of the injury, as well as the impairment. *See Manfredi v. Lorraine Cab Co.*, 1995 WL 6154, at *2 (6th Cir. Jan.5, 1995) (holding that plaintiff did not suffer a serious impairment to his back and left shoulder, in part, because "all of the doctors who examined [plaintiff's] back only recommended physical therapy" and because surgery was only a possibility for his left shoulder). Indeed, plaintiff has simply taken pain medication and undergone various forms of therapy (e.g. physical therapy and eating soft foods for 2–4 weeks). Fourth and finally, plaintiff merely missed two weeks of work and has not been severely (if at all) restricted in his daily life. *DiFranco*, 427 Mich. at 68, 398 N.W.2d 896 (holding that plaintiff's abilities and activities before and after the accident may be relevant insofar as they establish the existence, extent, and duration of plaintiff's impairment).

tio)~ship and noting that "when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant"). *Cf. Ruiz v. Whirlpool, Inc.*, 12 F.3d 510, 513 (5th Cir.1994) (testimony based on "conjecture or speculation is insufficient to raise an issue of fact to defeat a summary judgment motion because 'there is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party.... If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'") (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986)). As explained by the Michigan Supreme Court in *Kaminski v. Grand Trunk Western R.R. Co.*, 347 Mich. 417, 422, 79 N.W.2d 899 (1956):

> As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only. On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence.

■ "Of all the elements necessary to support recovery in a tort action, causation is the most susceptible to summary determination." *American & Foreign Ins. Co. v. General Elec. Co.*, 45 F.3d 135, 140 (6th Cir. 1995). "Litigants do not have any right to submit an evidentiary record to the jury that would allow the jury to do nothing more than guess." *Skinner*, 445 Mich. at 174, 516 N.W.2d 475.

#### b. Plaintiff Has Not Raised a Genuine Issue of Material Fact as to Whether Defendants' Vehicle Was the Cause In Fact of His Alleged Injuries

■ Once again, in the case *sub judice*, defendants contend that they are entitled to summary judgment as a matter of law because plaintiff cannot establish that defendants' tractor-trailer was the cause in fact of the alleged accident. This court finds that plaintiff has not adduced sufficient evidence from which a reasonable juror could conclude that defendants' vehicle was the cause in fact of the accident.

At his deposition, plaintiff explained his theory of causation. He testified that there was a piece of metal projecting outward from the bottom of defendants' tractor-trailer rig that was causing pavement on the freeway to tear apart. (Paisley Dep. at 35). Plaintiff testified that these chunks of pavement being torn apart by the piece of metal were "jumping" atop defendants' tractor-trailer rig. (Paisley Dep. at 39). According to plaintiff, one such piece of cement fell from the top of defendants' vehicle and through plaintiff's windshield, ultimately striking him. (Paisley Dep. at 39). Plaintiff testified that he actually witnessed the cement brick that hit him fall from the vehicle, but: "[he] didn't see it coming toward[s][him]." (Paisley Dep. at 31).

In this court's opinion, plaintiff's causation theory is incredible and thus insufficient to give rise to a genuine issue of material fact as to whether defendants' tractor-trailer rig was the cause in fact of plaintiff's injuries. In particular, the portion of plaintiff's theory which alleges that a metal rod hanging from underneath the vehicle kicked up a piece of concrete in the road, ultimately causing that piece of concrete to be thrown back onto the vehicle, defies all logic (not to mention physics). In fact, plaintiff's counsel conceded at oral argument that this theory was pure "surmise" and mere "speculation." (Transcript, May 28, 1997 Hearing at 11).

At oral argument, it was represented to this court that at the time of trial, plaintiff's causation theory would be different. It would be that "concrete existed on the [tractor-trailer rig] before the incident occurred," and that this concrete later flew off of the middle of the tractor-trailer rig, striking plaintiff's windshield. (Transcript May 28,

1997 hearing at 11). Yet, plaintiff has absolutely no evidence to support this alternative theory. Indeed, this theory seems just as incredible as the former theory when one considers that the trailer, from which the concrete allegedly fell, is incapable of carrying concrete since it is a skeletal, slanted frame with rollers, not a flat bed. (Hollingsworth Dep. at 18–19).

In sum, plaintiff has not proffered any evidence that would set up a "logical sequence" of causation. Instead, he has offered this court highly speculative and unfounded theories of causation. Summary judgment therefore must be granted the defendant on plaintiff's negligence claim.

The circumstances in the case at bar are similar to those in *Kasten v. U.S. Truck Co.*, 28 Mich.App. 466, 184 N.W.2d 508 (1970). In *Kasten*, plaintiff brought suit against defendants, the owner and driver of a tractor-trailer unit, for their alleged negligence in operating the tractor-trailer unit which caused the death of plaintiff's husband. "It was subsequently discovered that decedent had been fatally injured by a piece of spring steel, measuring approximately three inches by four inches and three-eighths in thickness, which had penetrated the windshield of his vehicle and struck him in the face." *Id.* at 468, 184 N.W.2d 508.

> The theory of plaintiff's case was that the piece of spring steel was on the traveled portion of the highway, that it was visible to the defendant driver who saw or should have seen it, and that the defendant driver negligently drove over the piece of steel and the wheel of defendants' vehicle sent the piece into the through [sic] the windshield of decedent's vehicle.

*Id.* at 468–69, 184 N.W.2d 508. The trial judge granted defendants' motion for directed verdict, holding that "plaintiff's cause rested 'primarily on conjecture and require[d] strained and multiple inferences.'" *Id.* at 469, 184 N.W.2d 508. More specifically, the court held as follows:

> Before the jury could consider the question relating to defendants' negligence, it would be required to assume that the steel spring was on the pavement, that the defendant ran over the spring, and that the wheels of defendants' vehicle threw the spring onto the decedent's windshield. Such a theory of causation, based upon the facts presented in the instant case, would rest entirely upon conjecture.

*Id.* at 469, 184 N.W.2d 508.

Such is the case here. Plaintiff's theory of causation is based entirely on conjecture. In order for the jury to consider the question relating to defendants' negligence, it would be required to assume that the cement was part of the road or on the road, that defendant's vehicle ran over the cement, that the wheels of defendants' vehicle propelled the cement back onto the vehicle, and that the cement fell from defendant's vehicle onto plaintiff's windshield. Or, the jury would have to assume that the defendants, in some other negligent fashion placed the piece of cement onto the vehicle and that the cement thereafter fell from the vehicle onto plaintiff's windshield. Since there is simply no evidence that defendants had anything whatsoever to do with the cement ending up on the tractor-trailer rig, plaintiff cannot establish a *prima facie* case of negligence, and summary judgment must be entered in favor of defendants on plaintiff's negligence claim.

For the foregoing reasons, this court grants defendants' motion for summary judgment.

### *ORDER*

**IT IS HEREBY ORDERED** that WATERFORD ROOF TRUSS, LTD. and RONALD NMI HOLLINGSWORTH's motion for summary judgment is **GRANTED.**

**SO ORDERED.**

### *JUDGMENT*

This action came before the court, Honorable Paul V. Gadola, District Judge, presiding, and the issues having been duly reviewed and a decision having been duly rendered.

**IT IS ORDERED AND ADJUDGED** that the case be dismissed with prejudice.

It is further **ORDERED** that the clerk serve a copy of the judgment by United

States mail on the counsel for plaintiff and on counsel for defendant.